The People of the State of New York, *ex rel.* Lorenzo Burrows, comptroller &c., *vs.* The Board of Supervisors of Orange County.

The act of April 12, 1855, imposing a state tax of a mill and a quarter on each dollar of the valuation of real and personal property taxable in this state, (*Laws of* 1855, *p.* 611,) was valid and constitutional. S. B. Strong, J., dissented.

The direction, in that act, that the money raised shall "be paid into the treasury of the state, to the credit of the *general fund*," is a sufficient statement of the *object to which the tax is to be applied*, within art. 7, sec. 13 of the constitution.

APPEAL from an order made at a special term, ordering a peremptory mandamus to issue. Upon an affidavit made by the relator, stating that he was the comptroller of the state of New York; that the board of supervisors of Orange county, at their last annual meeting, refused to levy or cause to be collected any tax upon the taxable property of the county of Orange, under or by virtue of chapter 335 of the laws of 1855, entitled " An act to provide the means to support the government," and had ever since refused to levy the same; that the amount of said state tax to be levied and collected under said law in the county of Orange, according to the valuation of the real and personal estate in said county, was the sum of $31,665.60; that the treasurer of said county had not paid said sum, or any part thereof, into the treasury of this state; and that said sum was absolutely required to enable the deponent to pay the demands upon the treasury of this state, required to be paid by law, an order was made at a special term, on the last Tuesday of July, 1856, directing that an alternative mandamus issue to the board of supervisors, commanding the said board forthwith to re-assemble, and to cause to be raised and collected in the manner prescribed by law for the collection of taxes, the said sum of $31,665.60, out of the taxable property of the county of Orange, as the same appeared upon the last assessment rolls of the several towns in said county; and also cause the same to be paid into the treasury

of this state pursuant to chapter 335 of the laws of 1855, or show cause why they should not do so, &c. An alternative writ being issued accordingly, the board of supervisors made a return thereto, showing for cause that the act of 1855 was in violation of the provisions of section 13 of article 7, of the constitution of the state of New York, which provides that " Every law which imposes, continues or revives a tax, shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such tax or object," in this, that the said act purports to be a law imposing a tax, and does not distinctly state the object to which the said tax was to be applied, but provides that, the money so to be raised and collected, shall be paid into the treasury of the state to the credit of the general fund. That, in and by the said act, chapter 335 of the Laws of 1855, it was further provided that of the money to be raised by the act above mentioned, $320,000 should be paid over to the canal fund, and was thereby appropriated towards any deficiency that might exist in the canal revenues towards the payment of interest on the state debt, under the provisions of article seven of the constitution, but contained no statement that there was such deficiency ; and that of the residue of the money so directed to be raised by the said tax, no statement was made or contained in the said act, of the object to which the same was to be applied, but by the provisions of the said act, the same was to be paid into the state treasury, to the credit of the general fund, and thereby the same was made subject to be applied to objects created by future acts of legislation. They further stated that the said tax of one mill and a quarter on each dollar of the valuation of the real and personal property, taxable in this state, in the said act provided for, would amount to a sum exceeding one million of dollars. That the general fund in the said act mentioned, consists of the stock, debts and other property of the state of New York heretofore known as the general fund, together with the increase and revenue thereof and any addition which may be

made to the same, and also of the duties paid into the treasury by hawkers, pedlers and petty chapmen, and the fees received by the secretary of state, comptroller, state engineer and surveyor, and that by law there is chargeable upon and payable out of the said general fund, all salaries and contingent expenses of the officers of the state of New York, including the members and officers of the state legislature, and of the members of the court for the trial of impeachments, the moneys required for the support of the state prisons, the annuities payable to Indians, and all expenses relating to Indian affairs, the expenses of all printing done for the state, and also the payment of all moneys directed by law to be paid out of the treasury, and not specially charged on any other fund; and they claimed and alleged that the said act was and is for the cause aforesaid null and void, and of no force or effect, and not binding or obligatory upon the said board of supervisors of the county of Orange, and that it was not and is not the duty of the said board to have levied or now to levy the said tax as in the said alternative writ of mandamus is required, and that therefore they refuse to comply with the requirements of the said alternative writ of mandamus.

To this return the plaintiffs demurred. The demurrer was sustained, at a special term, and a peremptory mandamus was ordered to be issued.

*C. H. Winfield,* for the appellants. I. The act of 1855, (*ch.* 335 *of Laws of* 1855,) imposing a tax of "one mill and a quarter on each dollar of the valuation of real and personal property, taxable in this state," is in violation of the provisions of section 13 of article 7, of the constitution of the state of New York, and is therefore void. (*Const. art.* 7, *sec.* 13. *Sess. Laws of* 1855, *p.* 611.) *First.* The said act imposes a tax, and does not distinctly state the object to which the same is to be applied. *Second.* The statement of the object to which $320,000 of the money to be raised, is to be applied, is insufficient, for the reasons: (1.) That it is appropriated to-

wards a contingent deficiency, there being no statement that any such deficiency existed. (2.) The reference to the provisions of article 7, of the constitution, is a reference to "another law to fix the object of the tax," and is declared insufficient by the section of the constitution referred to. *Third.* The act contemplates the collection, by virtue of the tax imposed, of an amount exceeding the $320,000, attempted to be appropriated, and the pleadings admit that the tax imposed will produce exceeding $1,000,000. No object for the application of the excess is stated. *Fourth.* Although the act provides that the moneys derived from the tax are to be paid into the treasury of the state, this is only a provision of a place of deposit, and not an appropriation of, or statement of the object "to which the tax is to be applied." *Fifth.* The directions that the same is to be paid to the credit of the general fund, is not such an application of the moneys to be raised, or a statement of the object to which the tax is to be applied, as is required by the section of the constitution referred to, for the reasons : (1.) That by the law in question itself, $320,000 of the moneys to be collected, and so paid to the credit of the general fund, are subsequently appropriated or applied to a specific object. (2.) The general fund consists of moneys derived from various sources, and applicable to various objects which are fixed by other laws, and can only be ascertained by reference thereto. (3.) By the act creating the general fund, all moneys directed to be paid by law out of the treasury, and not specially charged on any other fund, are a charge on the general fund. (1 *R. S.* 4th ed. *p.* 419, § 27, *sub.* 8.) The moneys therefore directed to be paid into the treasury to the credit of the general fund, are subject to be applied to objects created by legislation had subsequent to such payment into the treasury. *Sixth.* There is nothing in the act imposing such tax, or in the provision directing the payment of the moneys derived therefrom into the treasury to the credit of the general fund, which would prohibit the moneys to be collected, from being applied to objects created by acts of future legislation, and

such application would not be in violation of the provisions of the act itself,

II. In construing the provisions of the constitution in question, two rules should be observed: First. Where there is ambiguity of language, to hold the section to mean what the words most aptly and directly express. Second. If the terms employed be doubtful or ambiguous, to give such construction as will carry out the intent of the framers, and remedy the evil or prevent the abuse sought to be provided against or corrected. (*Story on the Const. vol.* 1, *p.* 340, 392, §§ 409, 460. *Gibbons* v. *Ogden*, 9 *Wheat.* 188. *Newell* v. *The People*, 3 *Seld.* 9, *opinions of Johnson and Edmonds. People* v. *Purdy*, 2 *Hill*, 31.) *First.* Applying to the provision in question, these rules of construction, the tax law of 1855 is manifestly in violation of the constitution, for the reasons: (1.) There is no ambiguity of language; the words used are not of doubtful meaning; a statement of the object to which the moneys to be raised are to be applied, is plainly required, and the law as manifestly omits to state any such object. (2.) To bring the law within the provisions of the constitution, would defeat the intent of the framers of the constitution, and the remedy designed to be afforded by it. *Second.* It is submitted that the provision of the constitution under consideration was designed: (1.) To prevent the imposition of taxes for undefined purposes. (2.) To inform the tax-payer of the use to be made of the money assessed upon him, and that without compelling him to resort to precedent or subsequent legislation; and (3.) To prohibit taxation for accumulation. Neither of these objects has been secured if the law in question is warranted by the constitution. *Third.* The meaning of the words in which the provision is clothed, is not to be enlarged or contracted, because of the inconvenience which may result from the construction contended for. (*Newell* v. *The People*, 3 *Seld.* 109, *opinion of Justice Edmonds.*) *Fourth.* The construction contended for, offers no embarrassment to the imposition or collection of necessary taxes; no

tax should be imposed until the necessity for it arises, and in such case there can be no difficulty in defining its object.

III. The law being unconstitutional, and therefore void, it imposed no duty of obedience to its requirements on the appellants. *First.* An act of the legislature in derogation of the constitution cannot possess the force of law. If the law in question was void in its operation upon the tax-payer, it was equally void as to its requirements of the agents or instruments in operating and enforcing it. *Second.* The supervisors cannot be compelled by mandamus to officiate in the execution of a law which is an infraction of the constitution, to which they, in common with the legislature, must yield obedience. (*Newell* v. *The People,* 3 *Seld.* 9. *Ex parte Lynch,* 2 *Hill,* 45.)

*S. B. Cushing,* attorney general, for the respondents. I. This mandamus is brought to compel the defendants to levy and collect the state tax directed to be collected by chap. 335 of the laws of 1855, and is the appropriate remedy.

II. The act is clearly constitutional. Art. 7, sec. 13 of the constitution requires that "every law which imposes, continues or revives a tax, shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object." Chapter 335, of the laws of 1855, is as follows: "An act to provide means to support the government. § 1. There shall be imposed for the fiscal year commencing on the first day of October, 1855, a state tax of one mill and a quarter on each dollar of the valuation of real and personal property taxable in this state, to be assessed, raised and collected upon and by the annual assessments and collection of taxes for said fiscal year in the manner prescribed by law, to be paid into the treasury of the state to the credit of the general fund."

The act is to "support the government." The tax is distinctly stated, to wit: "One mill and a quarter on each dollar," &c. The object to which it is to be applied is equally

distinct, to wit: "To be paid into the treasury of the state to the credit of the *general fund*." The mistake under which the defendants labored is, in not understanding this term "general fund." There are six different funds under the management of the comptroller, to wit: The general fund. (*Const. art.* 7, § 3.  1 *R. S. 4th ed. p.* 413.)  The general fund debt sinking fund. (*Const. art.* 7, § 2.)  The common school fund. (*Const. art.* 9, § 1.  1 *R. S. 4th ed. p.* 437.)  The literature fund. (*Const. art.* 9, § 1.  1 *R. S. 4th ed. p.* 437.)  The United States deposit fund. (*Const. art.* 19, § 1.)  The various rail road sinking funds and the mariners' fund, together with those held for the benefit of different tribes of Indians. Besides these, there are three funds under the control of the auditor, to wit: The canal fund. (*Const. art.* 5, *sec.* 51. 1 *R. S. 4th ed.*)  The canal debt sinking fund. (*Const. art.* 7, § 1.)  The canal enlargement fund. (*Const. art.* 7, *sec.* 3 *amended.*  1 *R. S. 4th ed.*)  Each of these funds is kept entirely distinct from the others ; and the means of the one cannot be used for any purpose, except that specified in the law creating it, and as distinguished by its title.  The general fund is as well known to apply to the support of government, as the school fund to apply to common schools, or the canal fund to apply to the canals.  Yet it would hardly be pretended that a tax for the benefit of either of these latter funds, by name, would not be sufficiently explicit.  Taxes for the support of government can be imposed by virtue of the sovereign power of the state, not abridged by the constitution.  They also can and must be imposed to increase the revenue of the sinking funds, under sec. 5 of art. 7 of the constitution.  They also can and must be imposed to pay the yearly interest and principal when due, where debts are contracted under sec. 12 of art. 7 of the constitution.  The object of sec. 13 of art. 7 clearly is, to designate to which *class* of these taxes the money, when raised, is to be applied.  This is the *object* meant, and does not require a bill of particulars, as the defendants suppose, in each particular case, to enable the people to know

how much money is expended, or for what purpose. The appropriation and supply bills furnish this important information.

*By the Court,* EMOTT, J. Whatever may be our decision of this question, it is to be presented to the Court of Appeals. Their determination will be submitted to, if not respected, because it will be final. As far as this court is concerned, after the distinct intimation which was made to us, I should feel disposed simply to pronounce the judgment which we deem right, without stating at any length the reasoning by which we have reached it, were it not that one of the members of the court, justly respected for his learning and experience, dissents from our conclusion. This induces me to give the reasons for that conclusion somewhat more fully than I should otherwise be inclined, under all the circumstances, to do.

The defendants have taken the ground that the act of the legislature, passed April 12, 1855, for the imposition of a state tax, is unconstitutional. They deny its authority, and have refused to levy, on the property of their county, the tax which it imposes. The present proceeding is a mandamus, instituted to compel them to levy and collect the tax; and a formal judgment having been rendered in favor of the relator at special term, without argument, the cause was argued before us in fact for the first time.

The objection taken to the validity of this act is that it conflicts with the 23d section of the 7th article of the constitution, which requires that every law imposing a tax shall, without reference to any other law, state distinctly the tax, and the object to which it is to be applied. A like objection will apply with equal force to all the general tax laws which have been passed under the present constitution. The law of 1855, now in question, directs the money raised by the tax to be paid into the treasury to the credit of the "general fund" of the state. The second section of the act directs the loan or advance of a certain amount of money thus raised from the general fund, to the canal fund, appropriates this amount

towards the deficiency in the canal revenues to pay the interest on the state debt, and provides for the repayment to the general fund of the money thus loaned, with interest. I do not rest the validity of this statute in any degree whatever upon this partial appropriation. The whole tax is imposed for, and applied to the benefit of, the general fund of the state, and I do not regard the second section of the law as being in any sense a specification of the object of the tax. It is an appropriation of a part of the proceeds, or rather it is an authority to the state officers to loan moneys which have been raised for one' object, to a fund which is created for another, and to charge the latter and its revenues with the repayment of the amount thus borrowed.

The precise question before us has been considered by Mr. Justice W. F. ALLEN, in the case of *The Black River Bank* v. *The Supervisors of Jefferson County*, and determined in favor of the validity of the law, in a well reasoned opinion.(*a*)

(*a*) The opinion referred to was given on the decision of a motion to dissolve an injunction obtained by the Black River Bank, to restrain the supervisors of Jefferson county from collecting the tax which had been levied under this same act of 1855, and is as follows:

" W. F. ALLEN, J. The remaining objection is to the validity of the *mill and a quarter tax* levied in pursuance of chapter 335 of the laws of 1855. (*Laws, p.* 611.) The act imposing the tax directs that when collected it shall be paid into the treasury of the state to the credit of the *general fund*, and it is claimed that this is not a statement of *the object* to which the tax is to be applied, as required by the 18th section of the 7th article of the constitution. The objection assumes that the direction to place the amount of the tax to the credit of the *general fund* is equivalent to a direction to apply the same to the payment of the several sums chargeable to and payable out of that, which objects are to be ascertained by reference to the various statutes creating them; that there is no general fund; but that the several claims upon the state which are not specifically charged upon a particular fund, are payable out of the treasury generally, and are called general fund debts, and that the term " general fund" does not mean a particular fund, but is simply a convenient expression to denote a provision made or to be made for the payment of these general fund debts.

But this is not the view which the legislature took of it. They regarded the general fund as known to and recognized by law as a thing *in esse*, as

This is the only decision which precisely touches the question. In *The People* v. *The Supervisors of Chenango,* (4 *Selden,* 317, 328,) Judge Willard, in delivering the opinion of the Court of Appeals, says: "The provision of the constitution requiring the question upon the final passage of a bill to be taken immediately upon its last reading, and the ayes and nays to be entered in the journal, is only directory to the legislature. There is no clause declaring the act to be void if the direction be not followed. It does not stand on the same footing with the requirement of a certain number to form a quorum or to pass a bill. In the latter case there is a defect of power, if the requisite number be not present or voting." We are not perhaps at liberty to consider these views as con-

having an existence either actual or constructive; that it was an object to which money could be appropriated, and which when appropriated would go to swell its amount, or to supply its deficiencies, and that from this fund appropriations were or might by law be made. That the addition of a given amount to the " general fund" by name, was the appropriation of the amount to a specified object. Whether right or wrong in this view, they certainly had the authority of precedent, if not of law, and I think they had both.

The revised statutes formed certain funds and property of the state known and distinguished as the " general fund," and it was then enacted that the same fund, together with the increase and resources thereof and *the addition* which might be made thereto, should be known and denominated as the " general fund." The amount of this tax was an addition to, and became, when paid into the treasury, a part of the general fund under this provision, and the same legislature by which the revised statutes were enacted supposed when they directed payments to be made to the general fund and what of the expenses of the government should be charged upon it, that the object and purpose of the payments and the source from which the appropriations were to be paid were stated intelligibly, and with sufficient explicitness and directness. (1 *R. S.* 189, § 1, &c.)

The financial officers of the state have always treated of the general fund, and kept accounts with it, and spoken of it as a fund well known; and in 1843 the comptroller, in his report to the legislature, says, that " many years since, the general fund had a capital of several millions of dollars, and the ordinary expenses of government were made a charge upon this fund by statute." The constitution of 1846, notwithstanding the capital of the general fund had been long since exhausted, treats it as still in existence and as a fund to which contributions may be made and which may be charged with the payment of appropriations. (*Const. art.* 7, §§ 2, 3.)

The People *v.* Board of Supervisors of Orange.

curred in by the residue of the court, or involved in the decision of the cause, but they come to us at least upon very respectable authority. There is no doubt a distinction between a constitutional provision regulating the manner of passing laws, and another in reference to what such laws shall contain, or how they shall be expressed, but the distinction is not very substantial. The fact adverted to by the learned judge, that the constitution does not declare an act void which is passed or is framed otherwise than it directs, is present in both cases. The consideration which he also notices, that such an express declaration has always been required in charters, where the whole authority of the corporation is derived from and conferred by the instrument itself, to convert such regulations into

In that instrument it was deemed a sufficient statement of the object of an appropriation to direct a payment into the treasury for the use of the general fund, and this in the same article which contains the section relied upon by the plaintiffs' counsel to sustain the objection to this law. I think that a specification of an object which was deemed sufficient in the constitution must be held sufficient to meet the requirements of the same instrument. (*See Laws of* 1828, *p.* 387 ; *of* 1835, *p.* 300 ; *of* 1836, *p.* 523 ; *of* 1837, *p.* 167 ; *of* 1841, *p.* 220.) This is not a statement of the object for which the tax is imposed, by reference direct or indirect to any other law. There is an obvious distinction between speaking of a thing or an institution established by law, and under which the law has come to have an active and well known existence, and the laws by which it has been created and brought into existence.

Our state prisons, our canals and asylums, all have an existence, and are objects to which appropriations may be made by name without a reference to the statutes under which they exist, or the purposes to which, in detail, the appropriations are to be applied.

It is not complimentary to the intelligence of the legislature or their constituents, to suggest that for the purpose designed by the constitutional provision, to wit, information to all interested of the object of the tax, and the general purposes to which the money raised is to be applied, that they may judge of the necessity and propriety of the measure, a more specific statement of the object is required than is here made.

Would it be urged that a tax for the benefit of the prisons should state in detail the amount to be paid to the officers for their salaries ; the amount to the sheriff for transporting convicts, and the several amounts to be applied to the repair of the buildings, support of convicts, &c. ? I think not, but a general statement that it was for the support of the prisons would be sufficient ; and if so, then the statement in this law of the object of the tax is sufficient.

restrictions upon the exercise of power, adds force to the argument in its application to a constitutional instrument, the whole of which is simply a regulation, and only where distinctly expressed, a limitation of the sovereign power of the people. We are not, however, controlled in our decision of this cause by this consideration; but it may be right and may become necessary to insist upon such a view of the directions and regulations as to the exercise of legislative power, which are so numerous in modern constitutions.

In the case of *The Sun Mutual Ins. Co.* v. *The City of New York,* (5 *Sandf.* 10; 4 *Seld.* 241, *S. C. on appeal,*) a question very analogous to the main question now before us, was passed upon by the superior court of the city of New York, if not subsequently by the Court of Appeals. The same constitu-

The objections in my judgment confound the "general fund" with the many charges upon it, and look upon the "fund" and the "charges" as convertible terms, and therein view the law as directing a tax to be levied for the payment of these charges by a general and indirect reference to the statute creating them. But the money when once in the hands of the treasurer, to the credit of the "general fund," becomes the property of the state and a part of that fund, and cannot be paid out of the treasury except by and in pursuance of other acts of the legislature which shall specify in detail the particular objects and purposes of the appropriation. (*Const. art.* 7, § 8.)

I have been unable to see any foundation for the objection taken to this law for unconstitutionality.

It is a serious matter to declare an act of the legislature deliberately passed unconstitutional, and disregard it as such; and it should not be done, especially by bodies and tribunals acting in an inferior and subordinate capacity, except in a very clear case. I certainly should be unwilling to do so at circuit or special term, except for reasons which were entirely conclusive and satisfactory.

The benefit of every doubt should be given to the well considered acts of the legislature, as the presumption is that they have not transcended their authority, and that every thing has been rightly done. Every act of the legislature may and should be thoroughly scanned; but a law may not, without danger of mischief, be regarded and treated as presumptively unconstitutional and void by the inferior tribunals for whose direction and control it has been enacted, without urgent cause and good reason. In regard to this law I cannot doubt that it is, so far as the only objection I have heard to it is concerned, in strict conformity with the constitution and entirely valid.

The motion is granted with $10 costs to abide event."

tional provision was invoked to defeat the annual tax bill for the city of New York, which stated the object of the tax authorized, and in effect imposed by the law, to be, "the defraying the various contingent expenses, legally chargeable to said city, and such expenses as the mayor, aldermen and commonalty may in any manner sustain or be put to by law." Chief Justice Oakley, in giving the opinion of the superior court, discusses the constitutional objection, and denies to it any force. In the Court of Appeals the point was not considered by Judge Gardiner, who delivered the opinion of the court. Whether the objection was abandoned, or the clause of the constitution to which it refers was thought to be applicable only to general tax laws, does not appear. I consider the case, however, as clearly furnishing evidence of the concurrence of the late lamented chief justice of the superior court, as well as of Judge Duer, who worthily succeeds him, and Judge Paine who sat with them, in the views of constitutional law which a majority of this court have adopted in this case ; and although accidental circumstances or judicial position may compel greater deference in fact to other authorities, it is impossible to feel higher respect, on such a question, for any tribunal than for one thus constituted. The objection which the defendants make here would certainly have been fatal to the law then before the court. All the uses and purposes of the "general fund" of the state belong to the same class of expenditures, and all are specified in the statute by which this fund is created or continued, (1 *R. S.* 189, 193,) except that it is also charged with "the payment of all moneys directed by law to be paid out of the treasury, and not especially charged on any other fund." There are certain great heads of public expenditure, which have separate and special funds for their support: indeed all such permanent objects of expense and control, besides the support of the government itself, may be said to be represented by their own funds and to be within this exception. If the city of New York possessed a fund for its salaries and expenses, established by law, intended to be

replenished by its revenues, and recognized in its charter, both as to its existence and design, and the city tax had been imposed to replenish that fund, the case would have been more like the one before us, conceding of course that the constitutional direction applies to local as well as general tax laws. But the difficulty which the counsel for the defendants find with the state tax exists to a still greater extent in the city tax. The object there stated is merely to furnish the means to defray whatever expenditures, or appropriations, the common council might make in their discretion—expenditures for particular purposes, not only contingent but discretionary. A specific appropriation, even to definite heads of expenditures, much more to persons or to special charges, is shown by Judge Oakley to be not only unnecessary but impracticable, in the case of the city. Such a course could only be made practicable in the government of the state by appropriating the whole sum to be raised by tax, in the same law by which the tax was imposed. Even then a considerable amount must be left for contingencies, which could not be specified, or the government could not be carried on at all. I am not willing to assent to a construction of the constitution which will lead to such consequences; unless it be literally inevitable.

But I am not convinced that either the letter or the spirit of the constitution requires a particular appropriation of the moneys to be raised by a tax, in the same law imposing the tax. The " general fund" is the collective designation of all the assets of the state which furnish the means for the support of the government, and the defraying the discretionary appropriations of the legislature; in other words, the necessary and contingent expenses of the government. It was so known and established when the constitution was framed, and is recognized by its very terms. Replenishing this fund, placing money in the treasury to answer these necessary and contingent expenses, is an " object" for which a tax may be levied and applied, within the meaning of the constitution; and it is stated with sufficient distinctness by the use of the general

term or appellation sanctioned by the constitution itself. The term "object," used in the constitution, to which the money furnished by the tax is to be applied, is not to be construed so narrowly as to restrict its meaning to a particular person or a particular appropriation. Its use in this connection is to require the legislature, in imposing taxes, to specify one or another of the classes of expenditure which they are obliged or allowed to incur. It may be a wholly contingent or discretionary class, and yet be one of the objects to which the revenues of the state may be applied. If every person or institution, or even every special cause of expenditure, were an "object" of the application of a tax in the sense of the constitution, every ordinary tax would have numerous objects to which it must be applied, and the constitution would have used the word in the plural. But the term is to be construed as intended to require the legislature to indicate the general design with which a tax is laid, and for which it is to be used, and not to specify either the persons or things upon which it is to be expended.

I consider the words "object" and "purpose," as used in this article of the constitution, as words of the same import. The word "applied" is used in connection with both. Thus sec. 1, which attempts to create a sinking fund for the payment of the canal debt, enjoins that such fund be "sacredly applied to that purpose." Sec. 2, which provides for a like sinking fund to pay the general fund debt, including the stocks loaned to corporations, contains the same language. Sec. 3 directs money to be "applied" to the completion of the canals. Sec. 8 directs that in appropriation bills the sum appropriated shall be "distinctly specified," and also "the object to which it is to be applied." There is an obvious distinction between the specification or application intended or required in an appropriation bill, which must point out the persons to whom money is to be paid, and the precise manner in which it is to be disbursed, and a tax law, which, according to all legislative usage, and the reason of the case, implies subsequent ac-

tion to appropriate or direct the payment of the money by disbursing officers. Still, even in an appropriation bill, an appropriation for contingent expenses has never been objected to, provided it were sufficiently distinct to show who were to receive or disburse it. In sections 10 and 11 the word "purpose" is again used in the same connection as the word "object" is in the clause we are considering.

In section 12, the language used in limiting the power to contract a debt, is that the "work or object" must be distinctly specified in the law creating it and which is to be submitted to the people, and the money raised is to be applied "to the work or object" so specified, "and to no other purpose." It would be an unreasonable as well as a narrow construction, which would restrict the meaning of the word "object," thus used, to the person recipient of the money or the expenditure. When the general purpose or design of the tax is declared, its object is specified, and the particular manner of its application to that object, the means of attaining it with the funds thus provided must be left to legislative discretion.

It seems to me that the only question in this case is whether the term "general fund," used in this law, indicates with sufficient distinctness any definite purpose, for which the money is wanted, and that it is quite immaterial that the items of the expenditure should be set down or enumerated. And I am clear that the "general fund" has a constitutional and a legal signification and existence, sufficient to answer this rule.

There were, when the constitution was adopted, and there still are, a number of objects or purposes for which the state needs money, and obtains it, either from its revenues and income, or by taxation. Money may be wanted for paying the interest on the state debt, or the principal when due; or repairing or enlarging the canals; for the common schools, or for the support of the government in all its branches, including those incidental appropriations which are made for different public purposes and to various public charities, on the

ground that these contribute in various ways to the welfare and good government of the state and its citizens. These purposes it may pursue and effect by committing them to its own officers, or by employing other agencies. They are all within the scope of our goverment, and they are all pursued by means appropriated by the legislature. For some a steady and uniform support is perpetually provided as part of the machinery of the state. Other objects are left to the occasional and discretionary bounty of the legislature. When funds have been provided for any of these specific purposes, whether included in the general design of government, or connected specially with the debts or the property of the state, the legislature are not intended, nor indeed if they observe the mandate of the statutes, allowed, to use the ordinary income or revenue, or the general and ordinary funds, for their benefit, except as is done in this law, by way of loan to these special funds. Thus the canals, common schools, academies, have each their proper fund, and on these all appropriations for their benefit are to be charged. But in the original arrangement of the funds of the state, that fund, or collection of assets, which was to supply the means to pay the expenses of government whether stated or contingent, together with all discretionary appropriations, was called the general fund. (*See* 1 *R. S.* 189.) Of course it was intended and expected that the revenues and property of the state would keep such a fund in actual and not merely nominal existence, and supply the means of carrying on the government, and dispensing the charities of the state without resorting either to taxation or borrowing. This expectation, it is true, has long been disappointed, and the "general fund" which was to furnish the means for these general and ordinary appropriations has ceased to be more than a name, except as it is replenished and renewed by special supplies. But whether its existence be actual or potential, it seems clear to me that the principle, and the true construction of the constitutional provision, remains the same. If not in actual existence in dollars and cents, as a source of

supply of these wants of the state, the general fund is at all events *nomen collectivum* for the means of providing for all these necessary and contingent expenses, which all fairly come under one head, the support of the government. When a tax is stated in the statute now before us to be levied for replenishing this fund, I feel no hesitation in saying that its object is distinctly stated. Its proceeds are to be applied to the general object of the support of the government, in such manner as the legislature shall direct in the exercise of a discretion which must, after all, be committed to them. The people are informed that the money is called for, not to pay the debt of the state, nor to repair or enlarge its canals, nor to support its schools, but to support its government, and pay those incidental expenses and appropriations which have always been made for public and beneficent purposes, in the discretion of the legislature, as part of the ordinary legislation of the state. This is one object of taxation allowed and contemplated by the constitution, and it is stated with all the distinctness enjoined by its terms or required by its spirit for any practical purpose.

If the legislature are too lavish in amount, or profligate in expenditure, in any of their appropriations, the amount of the tax will reveal the fact, and the people can correct the evil. No constitutional prohibitions can accomplish more than this, from the very nature of the case, and this will be attained just as surely when the tax is levied for this class of both necessary and contingent expenditures, under one general designation of the "general fund," as if the tax bill were tacked to the supply bill or the appropriation bill, and the legislature compelled not only to state the general object of the tax, but to proceed in the same law specially to appropriate its avails. The latter course must be adopted if the former be not permitted, and it is not easy to see what practical and beneficial object would be attained by compelling the legislature to pursue such a course. It might be a more literal, it would not be a more substantial, compliance with the constitution, than

the practice which has obtained the sanction of the legislature uniformly since the present constitution was adopted. It would simply result in making the tax bill and the appropriation bill one law instead of two, and in much consequent embarrassment to the government.

I will only add to this imperfect, although somewhat extended, discussion of this question, that reflection, observation and experience, I think, will alike teach us that if our courts desire to preserve an undiminished respect for themselves, and for the constitution, they should be careful in their application of this last resort of the citizen.

Of course, in a clear case we cannot hesitate, but it ought to be a clear case. The sovereign law-making power of the state is entitled to at least as strong a presumption in favor of the validity of its acts as a criminal on trial in favor of his innocence. The conflict between a statute and the fundamental law must be plain beyond any reasonable doubt, before we can convict the legislature, and annul their laws. These are obvious truths, and have been again and again repeated by courts and judges who, perhaps, have not in all cases acted up to their requirements. Neither must it be forgotten that the power of the legislature of the state of New York is not derived from, or conferred by, the constitution of the state of New York. That instrument does indeed organize a legislature and transfer to them the power of legislation of the people of the state. But it does not create the power, but only the instrument for its exercise. The power is the sovereign power of the people, and in a political and juridical sense, it is omnipotent and irresponsible, except where it is expressly restrained by the organic instrument. Whatever the people might do, the courts cannot prevent their representatives from doing, unless the people have positively and expressly forbidden it. The constitution of the state of New York is to be resorted to, therefore, not to see what powers are conferred upon the legislature, but what are withheld; not how they are authorized to act, but in what respects they are restrained

or forbidden to exercise power.    Such restrictions and limitations ought to be clear and explicit.    There is a wide distinction between such an instrument and a grant of limited powers like the constitution of the United States.    The same strict construction which demands an express grant of a doubtful power in the latter, is bound to furnish an explicit restriction in the former.

Constitutions will cease to be respected when they become common instruments of promoting litigation, and of defeating not only the actual and legitimately expressed will of the people, but the very end of government and laws.    There are certain great principles of liberty and the security of property enshrined in the constitution of the United States, and repeated in our state constitutions.    These may be justly called fundamental, and any attempts by the legislature to violate them will be met with prompt rebuke.    But directory regulations or rules of legislative action and the like, of which there are many in the present constitution, should be palpably transgressed in a point of real consequence before the action of the legislature should be arrested by the courts.    The constitution should not be invoked unless upon occasions which both require and deserve its interposition.    It is almost as easy under our system of government to alter or repeal a constitution as a statute, and if we are not careful both of our courts and our constitutions, it will become almost as frequent. That certainly will not be a desirable result to accomplish by the changes we have made, or the doctrines we may introduce.

The judgment of the court below must be affirmed, and a peremptory mandamus awarded with costs.

S. B. STRONG, J. dissented.

                                        Judgment affirmed.(*b*)

[KINGS GENERAL TERM, July 14, 1857.    *S. B. Strong, Emott* and *Birdseye,* Justices.]

(*b*) Affirmed by Court of Appeals.    See 3 *E. P. Smith,* 285.