# REPORTS

OF

# CASES ARGUED AND DETERMINED

AT THE JUNE TERM, 1867.

## TUSKALOOSA BRIDGE CO. *vs.* OLMSTEAD.

[BILL IN EQUITY TO ENJOIN INVASION OF FERRY FRANCHISE.]

1. *Constitutional provisions (art.* IV, § 2,) *as to requisites of amendatory laws.*—The constitutional provision contained in the second section of the fourth article, declaring that "no law, nor any section of any law, shall be revised or amended by reference only to its title and number, but the law or section revised or amended shall itself be set forth at full length," not only prescribes a rule of legislative procedure, but renders null and void any law which does not conform to its requirements. (JUDGE, J., *dissenting.*)

2. *Same; act of Feb. 3d, 1866, amending charter of Tuskaloosa Bridge Company.*—The act approved February 3d, 1866, entitled "An act to amend an act to incorporate a company to build a bridge across the Warrior river opposite the city of Tuskaloosa, approved January 2d, 1833," (Session Acts, 1865–6, p. 268,) in failing to set out at length the amended act, contravenes the provisions of the second section of the fourth article of the constitution, and is, consequently, null and void. (JUDGE, J., *dissenting.*)

APPEAL from the Chancery Court at Tuskaloosa.

Heard before the Hon. J. Q. LOOMIS.

THE bill in this case was filed by the appellant, on the 26th March, 1866, against Elisha S. Olmstead and others; and sought to enjoin the defendants from keeping and using a public ferry across the Black Warrior river opposite the city of Tuskaloosa, in alleged violation of the complainant's chartered rights, and to compel an account

2

of the tolls which the defendants had received from the ferry. The plaintiff was incorporated by an act of the general assembly of this State, approved January 2d, 1833, entitled "An act to incorporate a company to build a toll-bridge across the Black Warrior river opposite the town of Tuskaloosa."—Session Acts, 1833, pp. 86–88. According to the allegations of the bill, the bridge company was organized under the provisions of this act, and erected a bridge across the Warrior river, under the authority conferred on them by their charter, in 1835; which bridge they used, charging tolls as authorized by their charter, until some time in the year 1855, when it became so much worn by use, and being injured by a tornado, that it was deemed unsafe, and was therefore torn down, and a new bridge erected in its stead; and this new bridge was in like manner used by the company until some time in April, 1865, when it was burnt and destroyed by the military forces of the United States, under the command of Brigadier-General Croxton. At the time of the building of their first bridge by the company, there was a public ferry across the river, "a short distance below the site selected for said bridge;" which ferry had been established, many years before that time, under an order granted by the county court of Tuskaloosa county, and which, with all its appurtenances, was purchased by the said bridge company, in the year 1836, from one Reuben Dodson, "he being then the owner, or claiming to be the owner of said public ferry, and to have the right to sell the same." After the removal of the plaintiff's first bridge, and while the company was building their new bridge, "to wit, on the 2d July, 1855," the commissioners' court of the county granted them a license to keep a public ferry across the river, opposite the city of Tuskaloosa, at the foot of the wharf, for the term of ten years; and they complied with the conditions of the act, and established a ferry according to its terms. After the destruction of the new bridge by the military forces of the United States, an act was passed by the general assembly of the State, which was approved by the governor on the 3d February, 1866, and which authorized said bridge company to establish a

public ferry across the river, on the conditions and terms prescribed by said act; and said ferry was established by the bridge company under the provisions of said act. The said act of the legislature, which was set out in full in the bill, may be found in the session acts of 1865–6, (pp. 268–9,) and is in the following words:

"AN ACT to amend an act, entitled an act to incorporate a company to build a bridge across the Warrior river, opposite the city of Tuskaloosa, approved Jan'y 2d, 1833.

"Whereas, as the bridge built under authority of the above recited act was burned, during the late war, by the Federal forces under Brigadier-General Croxton; and whereas, the corporation, soon after the erection of their bridge, by virtue of said authority, did purchase of the then owner the ferry, near the site of the bridge, for the sum of two thousand dollars:

" SECTION 1. *Be it enacted by the senate and house of representatives of the State of Alabama in general assembly convened*, That the above recited act be amended, by additional sections, numbered and worded as follows, which additional sections shall, for all purposes, be deemed and held as a part of the original act, to the same extent, and in the same manner, as if the same had been incorporated therein at the time of its passage:

"SEC. 11. *Be it further enacted*, That said corporation shall be authorized to establish and keep a ferry across the Warrior river, at the sites or landings used by Reuben Dodson, at the time of his sale to said corporation, then the said ferry generally known as Dyer's old ferry, and to charge tolls at the rates fixed by the seventh section of this act; *Provided*, said corporation shall be required to keep up the ferry only at such times as the crossing of the bridge shall be impracticable or unsafe; *and provided further*, That nothing herein contained shall be so construed as to prohibit or restrict the court of county commissioners from the establishment of as many ferries opposite the town of Tuskaloosa, as now regulated by law, as the public convenience may require.

"SEC. 12. *Be it further enacted*, That if the said bridge company shall not, within three years from the passage of this act, in good faith commence the rebuilding of said bridge, and complete the same within five years from said date, the franchise hereby granted shall cease.

"SEC. 13. *Be it further enacted*, That when said bridge is rebuilt, as provided by the preceding section, said bridge company shall be required to keep up the bridges across the ravines on the road now leading from the north end of the bridge to Main street in the town of North Port; *Provided*, That, for that purpose, the court of county commissioners shall authorize said company to charge such reasonable additional tolls at the main bridge as may be just and proper; *and provided, further*, that no increase of tolls shall be allowed on foot passengers."

Approved, February 3, 1866.

The chancellor sustained a demurrer to the bill for want of equity, on the ground that the said act of February 3d, 1866, under which the plaintiff claimed the exclusive franchise of the ferry, was unconstitutional and void; and his decree is now assigned as error.

RICE, SEMPLE & GOLDTHWAITE, with whom was E. W. PECK, for appellant.—It is a well-settled rule, that a court will never declare a statute void, unless the nullity or invalidity of the act be placed, in their judgment, "beyond a reasonable doubt." Though not satisfied of its constitutionality, yet, if not satisfied of its unconstitutionality, it is the duty of the court to uphold it.—See the numerous authorities cited and applied in *Morrison v. Springer*, 15 Iowa R. 347–9; *Lehman v. McBride*, 15 Ohio, 591.

"The constitution, as applied to the legislative department, is a limitation, and not a grant of power."—*Morrison v. Springer, supra*, 342.

The fourth article of the constitution of Alabama relates to the legislative department. By the first section of that article, "the legislative power of this State" is vested in the two distinct branches of the general assembly. By the second section, certain directions or rules are stated, as to the

modes in which that power should be exercised. But there is no provision to the effect, that a failure to observe these directions or rules will avoid any fair exercise of the legislative power. Nor can it be justly claimed, from the language of the constitution, to be "beyond a reasonable doubt" that the framers of the constitution intended that such failure should avoid any fair exercise of the legislative authority. For, if such had been the intention, why was there not a clause inserted, "declaring the act to be void, if this direction be not followed"?—*The People v. The Supervisors of Chenango*, 4 Selden's Rep. 328; *Pim v. Nicholson*, 6 Ohio St. R. 178–180; *Miller v. The State*, 3 *ib.* 475; *Washington v. Page*, 4 Cal. Rep. 388; *Lehman v. McBride*, 15 Ohio Rep. 601; *Rairden v. Holden*, *ib.* 209.

As permanent rules for the proceedings of the two houses, the provisions of said second section of the fourth article of the constitution are important and beneficial, and are adequate to remove the real evils which induced the adoption of these provisions. "The only safeguard against the violation of these rules of the houses is their regard for, and their oath to support, the constitution of the State." The framers of the constitution deemed that safeguard sufficient; or they would have used such language as they used in the 18th section of the same article—"no bill shall have the force of law," unless these rules are complied with in its passage through the two houses.

To treat these provisions as mere rules for the two houses, obedience to which is exacted by their oath to support the constitution, is to free their interpretation from absurdity, contradiction, injustice, or extreme hardship. Although, in a certain sense, they are thus deemed as "directory" only, yet they are to be enforced by the two houses, and will surely be enforced by them, unless a majority shall prove themselves too weak to understand their oaths, or too corrupt to regard their sworn duty. Is it credible, that the framers of the constitution adopted the provisions in question in contemplation of any such case of imbecility or corruption on the part of a majority of the legislative department? Is such the deference paid by the framers of a government, to an independent department thereof, and

to that department to which was entrusted "the legislative power of the State"? To treat these provisions as not directory, but as absolutely imperative in every case, is to resort to an interpretation "most mischievous in practice," involving absurdity, contradiction, increased expenses of legislation, injustice, and extreme hardship, without any practical benefits. It is a settled rule, that when the literal interpretation of a constitution or statute involves such evil consequences, "the courts may deviate a little from the received sense and literal meaning of the words, and interpret the instrument in accordance with what may appear to have been its reason and spirit."—*Brooks v. Hicks*, 20 Tex. Rep. 666. And "the arguments of hardship, irregularity, injustice and inconvenience, will address themselves to the judiciary in constitutional cases, with more force than in regard to ordinary legislative acts ; just in proportion as it is more difficult to revise a constitution, or to escape its power, than to amend or to evade a statute."—Sedgwick on Stat. & Cons. Law, 491–493 ; *Taylor v. Taylor*, 10 Minnesota Rep. 116, *et seq.*

The authorities above cited put it beyond doubt, that the courts are, at least, as fully authorized and required to treat constitutional provisions as directory, as they are to treat statutory provisions as directory, for the purpose of enforcing the reason and spirit of the instrument. The horror of treating a provision of a constitution as directory, must give place, under the authorities, to the sober and calm inquiry, what was the meaning and intent of the framers of the instrument; what is the reason and spirit of the provision in question ? Every such constitutional provision should receive "a reasonable, not a technical construction"; such a construction as will be not only more consistent with the objects intended to be accomplished by it, but will be found necessary in the practical business of legislation."— *Lou. & Oldham Turn. R. Co. v. Ballard*, 2 Metcalf's (Ky.) R. 168–9 ; *Phillips v. Cov. & Cin. Bridge Co.*, ib. 219 ; *Johnson v. Higgins*, 3 ib. 566 ; *Parker v. Parker*, 10 Texas R. 83 ; *Murphy v. Menard*, 11 Texas R. 676 ; *Battle v. Howard*, 13 Texas R. 345 ; *Tadlock v. Eccles*, 20 Texas R. 782 ; *The State v. Andrews*, ib. 230.

Tuskaloosa Bridge Co. v. Olmstead.

In determining what is "a reasonable construction" of the constitutional provisions in question here, the courts should never lose sight of the following considerations : 1. The authority to pass a law, and the "mode" in which that authority may be exercised, are very different things. The usual essentials to the validity of a law "relate to the authority by which, rather than the mode in which laws are to be made." —*Miller v. The State*, 3 Ohio R. 483. 2. The objection to the statute in question here, is not to the authority of the legislature to pass an act containing every provision found in this statute, but merely to the mode in which that undoubted authority has been exercised. 3. The provisions of our constitution, relating to the "mode," were adopted for the first time in this State in September, 1865. Similar provisions had been adopted into the constitutions of some of our sister States, but all this occurred within a period fairly to be called modern ; there was no uniform settled construction prevailing in these States ; Ohio and California clearly held such provisions as directory only, as far back as 1854, and steadily adhere to that construction ; the New York court of appeals, in 1853, without any dissenting judge, announced the same construction.—4 Selden's R. 328. Conceding that some of the other States adopted the opposite construction, the fact is undeniable, that there was a known and clear conflict of judicial decision, as to the meaning of such provisions, at the very time our convention first incorporated them into our constitution. It is impossible, therefore, to hold with any degree of certainty, upon the adjudged cases only, which of these conflicting constructions the framers of our constitution intended to adopt. 4. In this peculiar state of facts and judicial expositions, the argument of the supreme court of California seems unanswerable and decisive. The substance of it is this : The first legislature that met under our constitution, evidently considered the constitutional provisions now under discussion as directory, as is proved by an inspection of a great number of their acts, including the very act assailed in this case. This contemporaneous exposition of the first legislature, composed of many who had participated as members of the convention in forming our con-

stitution, is so significant of the real intention of the con-
vention as to render it quite impossible for the courts to
say, beyond a reasonable doubt, that the intention of the
convention was to make the provisions in question impera-
tive, and not directory. The natural conclusion from the
acts of this first legislature, composed of so many of the
framers of the constitution, is, that in adopting the provis-
ions in question, the real intention was to adopt them in
the sense and with the construction shown in the cases
cited from 4 Selden, 328, and from the Ohio and California
Reports.

The objection to the statute in question, that it is in con-
flict with the 38th section of the 4th article of the consti-
tution, admits of a brief but conclusive answer. The origi-
nal charter of the appellant did not give it the capacity to
apply to a court for, or to accept from a court, the ferry
franchise granted by the statute here drawn in question.
A natural person could have procured from a court, and
have accepted and enjoyed, a ferry franchise. But no cor-
poration can do that, unless enabled by its charter to do it;
and this corporation was not so enabled by its charter. This
corporation had no capacity to acquire the ferry franchise,
under any "general law," or from any court. A special act
like the one in question was essential. This special act is
"an independent act," conferring upon the appellant a "new"
franchise; and to such "independent act," the constitu-
tional provision relied on by appellees, does not apply.—
Davis v. The State, 7 Maryland R. 151. "It was intended
to provide for a particular case, not hitherto provided for,"
a ferry franchise superadded to a bridge franchise.—15 Ohio
R. 209, 603.

The bill was filed here to protect appellant in the enjoy-
ment of a franchise, granted by statute; and is clearly
maintainable.—The Mayor of Columbus v. Rodgers, 10 Ala.
R. 37; Enfield Toll Bridge Co. v. Hartford & New Haven
R. R. Co., 17 Conn. R. 40; (S. C.) 2 American Railway
Cases, 69–77–90.

2. Even conceding the statute in question to be void, the
long possession and enjoyment of the ferry privilege by
the appellant, entitles appellant to maintain the bill, and

Tuskaloosa Bridge Co. v. Olmstead.

to have the benefit of the injunction.   In any point of view, there is error in the decree of the chancellor.—*Ogden v. Lund*, 11 Texas R. 690 ; *Harrell v. Ellsworth*, 17 Ala. 576 ; *Burden v. Stein*, 27 Ala. R. 104.

W. MOODY, and W. R. SMITH, *contra*.—The plaintiff's claim to the exclusive right to the ferry is based on three distinct grounds, each of which is worthless.   The license to Dyer & Dodson in 1833, purchased by plaintiff in 1836, requires no comment ; and the license granted to plaintiff, in July, 1855, by the court of county commissioners, is no better.—Code, § 701 ; *Wightman v. Karsner*, 20 Ala. 446 ; 21 Ala. 772.   The act of the legislature, approved February 3, 1866, presents the remaining (and indeed the principal) claim of title on the part of the plaintiff ; and this act, it is insisted, is unconstitutional and void, for several reasons, and in several distinct particulars.   It is in substance and effect, as its title purports, an amendatory act ; but the amended act is not set out in it, as required by the second section of the fourth article of the revised constitution.   It embraces two distinct subjects—viz., " to establish and keep a ferry across the Warrior river," and " to keep up the bridges across the ravines on the road"—while the same section of the constitution requires that " each law shall embrace but one subject" ; and each of these subjects is foreign to the title stated in the act.   These constitutional provisions are mandatory and imperative, and are equally binding on all the departments of the government.   Any other construction would render them nugatory and inoperative.

A. J. WALKER, C. J.—On the 3d February, 1866, an act was approved, which is entitled, "An act to amend an act to incorporate a company to build a bridge across the Warrior river opposite the city of Tuskaloosa, approved January 2, 1833."   The act approved on the 3d February, 1866, consists of a single section, which directs that the act recited in the title "be amended by additional sections, numbered and worded " in a specified manner, and that those additional sections should, "for all purposes, be

deemed and held as a part of the original act, to the same extent, and in the same manner, as if the same had been incorporated therein at the time of its passage." Then follow the three sections, numbered 11, 12 and 13, to be added to the original act. Those sections do, in fact, amend the act of January 2d, 1833. The later act does in fact amend the older. It is represented in its title as an amendment. It declares an express purpose to amend, and directs that the additional sections shall be deemed and held an amendment. It does not set forth the law amended, but refers to it by its title. The question thus arises, whether it contravenes the second section of the fourth article of the State constitution, and if it does, whether it is therefore void.

The language of the constitutional provision is as follows: "No law, nor any section of any law, shall be revised or amended by reference only to its title and number, but the law or section revised or amended shall itself be set forth at full length." In the cases of *Ex parte Pollard*, and *Ex parte Woods*, (39 Ala. 77,) we used the following language, in reference to the meaning and effect of this clause: "It was never intended by the constitution, that every law which would affect some previous statute of variant provisions on the same subject should set out the statute or statutes so affected at full length. If this were so, it would be impossible to legislate. The constitutional provision relates to those cases, where the act is strictly amendatory or revisory in its character. Its prohibition is directed against the practice of amending or revising laws by additions, or other alterations, which, without the presence of the original, are usually unintelligible. If a law is in itself complete, and original in form, it does not fall within the meaning and spirit of the constitution."

The act under consideration most clearly comes within the scope of the clause of the constitution thus construed. It is in form, not original, but amendatory. It is placed in the legal attitude of being incorporated in additional sections in the original act; and its full effect can not be determined, without reference to the original act; for the entire operation of one or more provisions of an act can

Tuskaloosa Bridge Co. v. Olmstead.

not be safely pronounced, without an examination of the others, with which, as parts of a whole, they are to be compared and construed. The act here is not in parallelism with those which, aiming at original legislation, affect some older law upon the same subject, merely because it happens to contain some different provision. The act in question is declared by the legislature to be an amendment. It is named and baptized by its authors an amendment. It falls actually, and by profession, in substance and in form, within the constitutional provision. A judicial exclusion of such an act from the prohibition of the constitution, would practically disregard its mandate. While it remains, it is our duty to enforce it, whether wise or unwise, convenient or inconvenient.

We have given careful attention to the argument, that the clause of the constitution under consideration is a mere rule of legislative proceeding, and does not render void a law not conformable to it. An anxious desire to allow effect to the will of the legislature, and to avoid a seemingly harsh visitation of a rule, the usefulness of which is hardly proportionate to its inconvenience, induced us to prolong our advisement on the case, with the hope of discovering reason or authority which would lead us to the support of that argument. But it still seems to us that the clause raises a question of legislative power, and is not a mere rule for the government of the general assembly in its proceedings. The prohibition is emphatic, that no law shall be revised or amended, except in the mode specified. This is a command, not specially, or professedly, addressed to the legislature alone. It is as general and comprehensive as any prohibition in the constitution. It is binding upon the executive, who approves or disapproves bills, and upon the judiciary, who declare the law, as well as upon the legislature. What warrant can there be, then, for the position, that it is simply a rule for the guidance of the legislature? When the constitution says no law shall be amended, save in a specified manner, can the legislature say a law may be and shall be amended in a different manner? The case is, to our minds, a plain one of irreconcilable conflict between the

paramount law of the constitution and the enactment of the legislature. When such a conflict is clearly presented to the judicial mind, the constitution must prevail.

Similar constitutional provisions are found in several other States; and the decisions, except in California and Ohio, concur in holding contravening acts void.—*People v. Laurence*, 36 Barb. 177; *Sharp v. May*, 31 Barb. 572; *Brewster v. City of New York*, 19 N. Y. 116; *Bibb County Loan Association v. Richards*, 21 Ga. 592; *Davis v. State*, 7 Md. 151; *Commonwealth v. Drewry*, 15 Grattan; *Johnson v. Higgins*, 3 Metcalf, 567; 4 La. Ann. 297; 5 *ib.* 94, 91; 11 *ib.* 722; 15 Texas, 311. In California, and in Ohio, the constitutional provision is regarded as merely directory.—*Lehman v. McBride*, 15 Ohio St. 573; *Pim v. Nicholson*, 6 *ib.* 176; *Pierpont v. Crouch*, 10 Cal. 315. The language of the Ohio constitution is somewhat different from ours, and that probably lessens the value of the decisions in that State as an authority here. The decision in Ohio is examined in *The People v. Laurence, (supra,)* and we entirely concur with the opinion in that case, that it is not allowable to set aside the obligation of a constitutional provision as directory.

There are, it must be conceded, regulations in the constitution, which are mere parliamentary rules, a want of conformity to which would not make a law void.—*People v. Board of Supervisors*, 27 Barb. 575. But the clause we are considering can not be classed with them. It is a restriction upon power. It takes away the authority to amend, except in a particular mode. It does not prescribe in what form, or by what rules, the legislature must act; but it prescribes what a law of a certain character must contain. It exacts that a law, amending another, must contain the law amended. The legislature can not dispense with this requirement. The inference of the purpose to guard the legislature against imposition and misapprehension and mistake, when a bill is passing through the forms of legislation, does not oppose the conclusion, that a diminution of power was intended. A restriction upon authority to amend laws in any other than the prescribed manner is the most effective mode of compelling an avoid-

ance of the evils contemplated. But it does not seem that the only good sought to be accomplished is effected when the legislature has acted. It is also important that the governor, in deciding whether he would approve or veto an amending bill, should be informed of the law proposed to be amended; and it is at least a convenience, that all who act under a law amending another, should have both presented together. It is, therefore, a mistake to suppose, that the clause of the constitution accomplishes all its purposes, and exhausts its beneficence, while a bill is passing through the stages of legislation. It therefore cannot be a mere parliamentary rule. It was not designed, like a parliamentary rule, to operate exclusively upon the legislature, and only to govern *them* in the discharge of their duties; and our argument cannot be affected by the concession of the principle, that non-conformity to established rules of the general assembly does not make its enactments void. To have the law amended and the amending law presented in juxtaposition, facilitates the comprehension, and consults the convenience of all who examine the law after its enactment, as well as of the legislature, which examines on its passage. From the effect of the constitutional clause it may be argued, that its purpose was to assist and protect the legislature against misapprehension; but, in the same mode, the purpose to assist and protect others may be inferred. It therefore can not be, that no other operation was intended than the assistance and protection of the legislature by affording a conservative rule for its guidance.

While the question is not in words decided in *Ex parte Pollard, (supra,)* there underlies the argument of the opinion in that case, an admission that a law infringing the provision of the constitution would be void.

The constitution (Art. 1, § 1) expressly declares, that all laws contrary to its provisions shall be void. The amending act here is obviously contrary to a provision of the constitution. The amending act does not contain the act amended; and if it is not void, we have what the constitution says shall not be.

What we have said shows, that the complainant had no

ferry franchise, derived from the act of the legislature. The bill in chancery is, therefore, without equity, so far as any right based on the act of the legislature is concerned. The bill is equally without equity in respect to a ferry franchise granted by the commissioners' court, for the period of that grant had expired. The allegations of the bill show no right to the ferry predicated upon long possession and enjoyment. The complainant showing no right to the ferry franchise on any ground, the bill was without equity.

The decree is affirmed.

JUDGE, J.—I cannot concur in the conclusion attained by the majority of the court, on one question involved in this case, and feel it incumbent upon me to state briefly some of the reasons which induce me to dissent.

The second section of the fourth article of the State constitution prescribes certain rules for the government of the legislative department in the enactment of laws. They are as follows : "All laws shall be passed by original bill, and their style shall be, *Be it enacted by the senate and house of representatives of the State of Alabama, in general assembly convened.* Each law shall embrace but one subject, which shall be described in the title ; and no law, nor any section of any law, shall be revised or amended by reference only to its title and number, but the law or section revised or amended shall itself be set forth at full length."

These fundamental rules are not *directory* merely—such as may be observed by the legislative department, or not, as may suit their convenience or pleasure. They are *mandatory*, and as binding upon the legislative department, as any constitutional injunction can be. But, being rules of *procedure* only, prescribed for, and directed to, the legislative department *exclusively*, their observance and enforcement must depend alone upon the judgment and conscience of the individual members of that co-ordinate and co-equal department of the government.

I concede the power to the judiciary to declare constitutional law, and in cases where statutes, *as rules of action,* are violative of the constitution, to override the express

will of the legislature. Life, liberty, and property, sometimes depend upon the wholesome exercise of this power, and I would not abridge it. It is a high prerogative, legitimately belonging to the judiciary; and in the United States, where legislative bodies are not, like the parliament of Great Britain, omnipotent, it rests upon sound reason and the highest authority.

But no such question is here involved; it is a question of *correct legislation* only, that is presented for our decision; it is, whether a parliamentary rule, prescribed by the constitution, and applicable only to bills in their passage through the legislature, has been observed or disregarded by the law-making power? Has the judiciary the power to determine such a question, unless it be expressly conferred by the constitution?

The powers of the State government are divided into three distinct departments, each of which is confided to a separate body of magistracy. The power of legislation being vested exclusively in the legislative department, they must, of necessity, be the sole judges of what is merely correct legislation. One, and but one, exception is made in the constitution, which I shall presently notice. If this be not a correct proposition, what becomes of the second section of the third article of the constitution, which declares that, "*No person, or collection of persons, being of one of these departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted?*" Can the judiciary step into the legislative department, on a question involving only the correct manipulation of the machinery of legislation, and supervise and control it? I have been unable to find language in the constitution, either "expressly *directing* or *permitting* this to be done;" and, in my opinion, the judiciary cannot do it, without erecting themselves "into a co-ordinate political authority, and becoming practically associated with the law-making department," in violation of the express prohibition of the constitution.

The courts of the country have been prompt to recognize the boundaries which separate the legislative from the judicial power, when encroachments have been made by the

former upon the latter.—Sedg. on Con. Law, 167—170.
They should be equally as prompt to recognize the exclu-
sive powers of the legislative department. As has been
said by a distinguished author, in treating of the enlarged
and generally conceded powers of the judiciary in declaring
constitutional law : "Let the magistrate be contented with
his large authority, and let him not, by endeavoring to
extend it, endanger the power that he now securely pos-
sesses. The judicial department should be the most
vigilant by its example to resist 'that spirit of encroach-
ment which tends to consolidate the powers of all the
departments in one, and thus create, whatever the form of
government, a real despotism.'"—Sedg. on Con. Law, 219.

I have stated, that there is one case in which the judi-
ciary would have the power, the question being properly
presented, to declare an act of the legislature invalid, for
non-compliance with a constitutional requisition in its
passage. The constitution declares, that "no bill shall
have the force of a law, until on three several days it be
read in each house, and free discussion be allowed thereon,
unless, in case of urgency, four-fifths of the house in which
the bill shall be depending may deem it expedient to dis-
pense with this rule."—Art. IV, § 18. It is by force of
the language employed in this section of the constitution—
"no bill shall have the force of a law"—that the judiciary
would be required, in the case stated, to declare that the
act was not a law, and to deny to it all force as such; for
the constitution, in denying the force of a law to a bill
passed in disregard of the requisites named, makes an
injunction upon the judiciary department not to enforce it
as a law. No such injunction exists as to that portion of
the constitution which presents the main question under
discussion. And from this, an additional argument may
be adduced in support of my conclusion upon the main
question—viz., that if the framers of the constitution had
intended that no bill should have "the force of a law," if
passed in disregard of the second section of the fourth
article, they would have so declared, as they did in refer-
ence to the second section of the third article ; and having
declared it in the one case, and not in the other, the

inference is legitimate, that they did not intend the same result should follow, whether the non-compliance was with the one or the other.

The last clause of the last section of the bill of rights, declaring that all *laws* contrary to the provisions of the bill of rights, or the provisions following in the constitution, "shall remain void," was not intended to apply to rules of *legislative procedure*, prescribed by the constitution. Otherwise, why was it subsequently declared that "no bill should have the force of a law," unless passed as directed? This was a nugatory provision, if the last clause of the bill of rights accomplished the same purpose. The character of the "provisions" preceding this clause, to which it applies, is a clear indication of the character of the provisions following, to which it was intended it should be applied, viz., to *provisions of laws, in and of themselves, as rules of action.* Any other construction, it seems to me, is unwarranted by the phraseology itself of the clause, and unsound.

I do not feel concluded by any decision of this court, heretofore made, relating to the effect of the constitutional provisions under consideration. Neither in *Ex parte Pollard* and *Ex parte Woods*, nor in any other adjudication of this court, was the precise question here involved, considered and decided. The doctrine of *stare decisis*, therefore, does not apply.

I deem it unnecessary to say more, though the conclusion attained by myself upon the question decided by a majority of the court, might be strengthened by other arguments, especially by some of those suggested in the briefs of the able counsel for the appellants.