## NEW YORK COMMON PLEAS.

CHARLES COOPER AND JOSEPH P. DISBROW agt. JACKSON S.
SCHULTZ and others, constituting the Metropolitan Board
of Health.

The act creating the *Board of Health* in the city of New York, is *not unconstitu-
tional*: 1*st.* Because as alleged, conferring the right on the board to *deprive a
citizen of his liberty and of his property,* without due process of law:
2*d.* Because as alleged, conferring upon the board powers of *local legislation,*
which under the constitution, can be conferred by the legislature only upon
boards of supervisors, municipal corporations and incorporated villages;
3*d.* Because as alleged, it confers upon the board *judicial powers,* in contraven-
tion of the sixth article of the constitution, which provides for and limits the
judicial department of the government.

*Special Term, September,* 1866.

THE plaintiffs brought this action to prevent the enforce-
ment of the following ordinances made by the Metropolitan
Board of Health :

§ 39.   That no person shall become, or continue, or engage
as or in the business of a butcher or cattle dealer, or as a
vegetable dealer at or in any public or private market or
stand in the cities of New York or Brooklyn, in said district,
without a permit therefor from this board.

§ 45.   That no cattle shall be driven in the generally built
up portions of either of the cities of New York or Brook-

lyn, except between the hours of nine of the evening and one hour after sunrise of the next morning; nor shall more than twenty cattle, or more than one hundred hogs, or more than one hundred sheep, be driven together; and they shall be driven in streets and avenues (leading towards their destination), where they will least endanger the lives of human beings.

§ 94. That no cattle, swine or sheep, geese, goats or horses, shall be yarded within or adjacent to the built up portions of either of the cities of New York or Brooklyn, without the permit of this board, or otherwise than according to the regulations.

The plaintiffs alleged that the enforcement would interfere seriously with their business, and that of all other butchers; that it would render it impossible to carry on the business in the way it had been heretofore carried on, and greatly increase the expense of carrying it on at all. It was alleged that the ordinances were void, both because the act establishing the board of health was unconstitutional; and because, even if it were constitutional, these ordinances were not made in the exercise of any powers granted to the board. It was also alleged that the board intended to order the removal of all slaughter houses from the city. Numerous affidavits were submitted on behalf of the plaintiffs, on which a preliminary injunction had been granted. The defendants, in moving to dissolve the injunction, submitted numerous affidavits showing accidents to have happened from driving cattle in the streets. They denied any intention to order the removal of all slaughter houses.

JAMES T. BRADY *and*
A. R. LAWRENCE, JR., *for the plaintiffs.*

*First.* The act of February 26, 1866, entitled, " An act to create a Metropolitan Sanitary District and Board of Health therein, for the preservation of life and health, and to prevent the spread of disease," is in conflict with various provisions of the constitution of this state, and therefore

illegal and void. These provisions will be alluded to in order.

*Second.* The first section of the first article of the constitution provides, " that no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, *unless by the law of the land or the judgment of his peers.*" And the sixth section of the same article provides " that no person shall  *  *  *  be deprived of life, liberty or property, *without due . process of law,* nor shall private property be taken for public purposes without compensation."

These phrases have received judicial exposition, and their meaning is clearly defined.   Judge COMSTOCK in *Wynehamer* agt. *The People* (3 *Kern. p.* 393), says :  " The true interpretation of these constitutional phrases is, that when rights are acquired by the citizen under the existing law, there is no power in any branch of the government to take them away ; but where they are held contrary to the existing law, or are forfeited by its violation, then they may be taken from him ; not by an act of the legislature, but in the due administration of the law ilself, before the judicial tribunals of the state."

And Judge BRONSON, in *Taylor* agt. *Porter* (4 *Hill,* 145), in reference to the same provision in the constituiion of 1822, holds this language :  " The meaning of the section seems to be that no member of the state shall be disfranchised or deprived of any of his rights or privileges, unless the matter shall be adjudged against him upon trial had according to the course of the common law."

And Chancellor KENT, in his *Commentaries* (*vol.* 2, *p.* 13), says :  " The better and larger definition of *due process of law* is, that it means law in its regular course of administration through courts of justice."

(*a*) The act in question conflicts with both of these sections of the constitution.   The provisions of the fourteenth section of the act, gives to the board of health power to destroy any building or other thing, which the said board may regard as a nuisance.   In the first place, the board of

health on *ex parte* statements, determines that the building, etc., is a nuisance, it then orders it to be removed, the privilege being reserved to the owner, occupant or tenant, etc., of appearing before the board and attempting to obtain from them a modification or recission of the order for the removal or abatement of the alleged nuisance. The board of health in this proceeding does not follow the course of the common law, in the language of Judge Bronson, nor is it one of the courts of justice of the state, in the language of Chancellor Kent. It exercises a summary jurisdiction unknown to the common law, unknown in the ordinary administration of the law in the courts of this state; decides that a citizen's property is a nuisance, and orders it to be destroyed, without giving to him any opportunity of availing himself of the protection which would be extended to him through the forms which prevail in the courts, or any opportunity of having the question tried by a jury, whether the building or other property, which is the subject of the order of the board of health, is or is not a nuisance.

*Third.* The seventeenth section of the third article of the constitution provides, that the legislature may confer upon the board of supervisors of the several counties of the state, such further power of local legislation and administration, as they shall, from time to time, prescribe.

(*a*) We conceive that the above section prohibits by implication, the legislature from conferring powers of local legislation upon any bodies other than boards of supervisors, except municipal corporations and incorporated villages. (*Mayor, etc.* agt. *Ryan*, 2 *E. D. Smith, p.* 368; *Tamer* agt. *Trustees of Albion*, 5 *Hill*, 121.) And by the act under consideration, the board of health thereby created, is vested with power to pass by-laws and orders or ordinances, upon subjects which have been heretofore confided exclusively to the cities of New York and Brooklyn, and the supervisors of the various counties embraced in the metropolitan district (§ 20 *of act*).

*Fourth.* The sixth article of the constitution prescribes the organization of the judicial branch of the government,

and the fourteenth section of that article provides that, "inferior local courts of civil and criminal jurisdiction may be established by the legislature in cities; and such courts, except for the cities of New York and Buffalo, shall have a uniform organization and jurisdiction in such cities."

(a) The power of the board of health in determining whether a building or "any other matter or thing," is a nuisance, is judicial. They are constituted a court for the trial of the question of nuisance or no nuisance (14th § of the act). Again, the power to determine whether there has been any violation or resistance by any person in said district of any such law, ordinance or order, and to issue a warrant for the arrest of such person, is a judicial power of the gravest and weightiest character, involving, as it does, the liberty of the citizen. Besides, the legislature, in order that there shold be no doubt as to the judicial character and power of the board, has in the thirty-first section of the act declared that "the action, proceedings, authority and orders of said board, shall at all times be regarded as in their nature judicial, and be treated as prim facie just and legal."

Now we conceive that the legislature in the first place has no power to create such a tribunal, and compel individuals to submit their property, rights and privileges as citizens, to its control (People agt. Mayor, etc. 42 Barb. 549).

The board of health is not a local court, as constituted by the act in question. Its jurisdiction is not confined to the city of New York or the city of Brooklyn, but extends all over the metropolitan district. Neither is it an inferior court. No appeal is given by the act from its decision. And even if a certiorari would lie to the board, there would be no opportunity to review its decision on the merts.

The powers of the board are more extensive than those of the supreme court, our highest court of judicature, in regard to the matters subjected to its control by the act.

(b) But in the next place, even if the legislature has power to confer judicial functions on the board of health, even if the board can be regarded within the meaning of the constitution, as an inferior local court of civil and criminal juris-

diction, and as being established in a city, then we say that by the eighteenth section of the sixth article of the constitution, " all judicial officers of cities and villages, and all such judicial officers as may be created by law therein, shall be elected at such times and in such manner, as the legislature may direct."

The commissioners are appointed by the governor and senate, in defiance of this provision.

(c) The case of *Sill* agt. *The Village of Corning* (15 *N. Y. R.* 297), is not adverse to this view. In that case the court held that the legislature might create inferior tribunals *for villages.* It did not hold that the legislature could appoint such officers, nor that it could create a court of such general powers as the board of health in several counties. Indeed, the reasoning of Judge DENIO in that case, goes far to show that the legislature could not constitute such a court as the board of health.

*Fifth.* The plaintiffs would have been entitled to maintain this action on behalf of all the butchers in the city of New York, in the court of chancery.

(*a*) The rule in the court of chancery was, that where the parties interested in a question were so numerous as to make it impossible or very inconvenient to bring them all before the court, a part of them might file a bill on behalf of themselves and all others standing in the same relation. (1 *Dan. Ch. Pr.* 183, note ; *Robinson* agt. *Smith,* 3 *Paige,* 222 ; *Brinckerhoff* agt. *Brown,* 6 *Johns. Ch.* 139.) And the right of a few to sue in behalf of all, was by no means confined to the cases of creditors and legatees, but the necessity of the case has induced the court frequently to depart from the rule that all parties interested in a question must be joined in the suit brought to determine that question. (*See* 1 *Dan. Ch.* p. 232 ; *Kendall* agt. *Van Rensselaer,* 1 *Johns. Ch.* 349 ; *Hallett* agt. *Hallett,* 2 *Paige,* 18–20 ; *Cullen* agt. *Duke of Queensburg,* 1 *Brown's C. C. Perkin's* ed. 101 *and notes ; Moffat* agt. *Farquarhson,* 2 *Brown's C. C.* 338, note 1 ; *Chancey* agt. *May. Prec. Ch.* 592.)

A bill was allowed where all the inhabitants of a parish

had right of common under a trust to be filed by one of the inhabitants on behalf of himself and all others (*Blackham* agt *The Wardens of Coldfield*, 1 *Ch. C.* 269). And one owner of lands in a township was permitted to sue in behalf of himself and the others, to establish a contributory *modus* for all the lands there (*Chaytor* agt. *Trinity College*, 3 *Anstruther*, 841). Also by the captain of a privateer, on behalf of himself and all the other mariners on said privateer, against the owners, for an account and distribution of all the prizes made by the ship (*Good* agt. *Blewitt*, 13 *Vesey*, 397).

(*b*) It was, however, always necessary that the bill should allege that it was filed on behalf of the plaintiff and of all others similarly interested, and if such an allegation was not made, a plea or demurrer for want of parties would lie. (1 *Daniel's Ch. Pr.* 237; *Wood* agt. *Draper*, 4 *Abb.* 322, *and cases cited.*)

Our complaint contains an allegation that the action is brought in behalf of the plaintiffs, and of all others similarly interested, &c (*Complaint, fol.* 15, *8th paragraph*).

*Sixth.* Even if the plaintiffs could not have maintained this action on behalf of all the butchers in the city of New York, under the rules which prevailed in the court of chancery, there can be no doubt of their right to maintain such an action under the provisions of the Code of Procedure.

(*a*) The 119th section of the Code provides that when the question involved is one of *common* or *general* interest of many persons, *or* where the parties are very numerous, and it may be impracticable to bring them all before the court, *one or more* may sue or defend for the benefit of the whole.

There are under this provision three classes of cases in which one or more may sue in behalf of the whole.

1st. Where the interest of the parties in whose behalf the suit is brought, in the question involved, is *common.*

2d. Where the interest of the parties in the question involved is *general.*

3d. Where the parties *are very numerous*, and it would be impracticable to bring them all before the court.

Now we contend that this action can be sustained as

belonging to any and to all of the above classes of cases. It is brought for the purpose of determining whether the board of health has any legal existence, and also to determine whether, conceding that the board has a legal existtence, it has the power to compel every butcher in the city of New York to take out a permit for leave to transact his business, and is compellable to drive his cattle at such times only as the board of health may see fit to permit him to do so. The defendants have assumed to pass general ordinances by which they control all these matters.

Surely nothing can be plainer than that all the butchers in the city of New York have a common and a general interest in knowing whether those ordinances are valid or invalid. The ordinances affect and change the whole manner of doing the butcher business in the city of New York. Whether such an ordinance is within the powers of the defendants, is a question of a common and a general interest to all engaged in that business.

Again, it is quite apparent that the parties are too numerous to make it practicable to bring them all before the court.

The complaint shows that there are one thousand butchers in this city.

This brings the action within the third class of cases, in which one is allowed by the Code to sue in behalf of all.

(b) But we are not without judicial guidance on this point. The general term of the supreme court, in the case of *McKenzie* agt. *L'Amoureux* (11 *Barb.* 516), decided that the above provision of the Code declaring that when the parties are very numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all, applies indiscriminately to *all actions*, whether they involve common interests or not (*McKenzie* agt. *L'Amoureux*, 11 *Barb.* 516).

Even conceding then that the question involved in this case is not one of common interest to all the butchers in New York, it is of general interest, and the parties are too numerous to bring them before the court.

*Seventh.* The powers of the board of health, conceding

the act under which it is created to be constitutional, are confined to matters which are purely sanitary, and do not extend to matters which are the subjects of municipal regulation. (*Act, Laws* 1866, *vol.* 1, *pp.* 121–130, §§ 12, 13, 14; *Amendatory Act of April, pamphlet,* § 12; *Opinion of* INGRAHAM, *J. Washington Market Case.*).

*Eighth.* The board of health have no power under the act creating them, to pass the ordinances which are set forth in the complaint.

(*a*) By the 20th section of the act as amended in April, the board are authorized to enact such by-laws, rules and regulations as it may deem advisable, in harmony with the provisions and purposes of this act, and not inconsistent with the constitution or laws of this state, &c., and shall in like manner make and publish a code of health ordinances for the protection of the public health.

Now as far as the driving of cattle is concerned, we say that it can in no true sense be alleged to be a nuisance which affects the public health or life.

It is true that by an industrious exploration of the records of the police department for many years past, a few cases of accidents arising from the driving of cattle in the streets of the city of New York, have been found.

To speak exactly, the whole number of accidents from 1863 to 1866, which are either distinctly or vaguely verified by the defendant's affidavits have been twelve.

Some of these are supposed cases however, not being positively sworn to. But assuming twelve to be the correct number, the whole number of accidents have amounted to just four a year for the three years last past.

It appears by the affidavit of Jacob W. Moore, presented by the plaintiffs, that during the last seven years one million seven hundred and forty-nine thousand and nine (1,749,009) cattle have been driven through the streets of New York, or very nearly two hundred and fifty thousand head of cattle per year. And yet the defendants can show but four accidents a year from driving such an immense number through the streets.

Any argument, therefore, which seeks to prove that such a business is, within the meaning of the act, detrimental to life or health, falls to the ground.

The same argument could, with greater force, be used for conferring upon the defendants the power to pass ordinances regulating the running of railroad cars, or omnibusses or carriages on the streets.

The Third Avenue railroad cars alone, injured or killed seventeen persons between October, 1863, and October, 1864, as appears by the report of the state engineer for 1864. And the whole number killed or injured for the same year by railroad cars, was forty-four. And we do not hesitate to assert that more persons are injured from the falling of bricks from the hod during each year than are injured by the driving of cattle.

*Ninth.* But in the next place the board of health is only authorized to pass such ordinances as are not inconsistent with the laws of the state.

(*a*) By the charter of the city of New York, the right to establish markets is vested in the corporation, and the supervision of the same in the superintendent of markets, who was formerly the head of a bureau in the city inspector's department, but the bureau was in 1863, transferred to the finance department. (*Charter* 1857, § 27; *Laws* 1863, *p.* 407 [*Tax Levy*]; *People* agt. *Lowber,* 28 *Barb.* 65.)

The plaintiffs, and all the other butchers in the city of New York, have been duly licensed as provided by law, to carry on their business of slaughtering cattle and selling their meat. They have a license for slaughtering from the United States authorities. (*For provisions as to butchers' licenses see Revised Ordinances* 1859, *pp.* 167, 341, 342, *&c.*)

It would be in violation of their rights thus acquired, that they should be compelled to take out further permits from the defendants, and inconsistent with the provisions of the charter which are unrepealed.

(*b*) The provision in the 12th section of the health law as amended, does not aid the defendants, as their control over the markets only relates to their cleanliness, ventilation and

drainage, and the prevention of the sale of unwholesome articles therein. (*See* 12*th* § *as amended ; Hoffman* agt. *Schultz, opinion of* INGRAHAM, *J.*)

*Tenth.* The whole subject of granting permits to butchers and the keepers of cattle yards, is a matter of municipal regulation, and can by no fair construction of the act of 1866, be considered as lodged in the defendants.

*Eleventh.* The same argument which proves that the defendants can compel butchers and marketmen to take out permits for the privilege of carrying on their business, necessarily must prove also that the defendants have power to compel those who are engaged in any kind of business which they choose to declare detrimental to health or life, to take out permits for leave to carry on such business.

*Twelfth.* The ordinances set forth in the complaint, are not wrrranted by the act of 1866, and are null and void. Being null and void, as it is clear from the affidavits presented, that their enforcement will either totally destroy or so materially injure the business of the plaintiffs and of all other butchers as to make it useless, the injunction, on familiar principles, should be retained.

*Thirteenth.* The idea which has prevailed in some minds, that the defendants are not subject to judicial control in the exercise of their power, is erroneous.

The true rule on this subject was laid down by the supreme court in *Barker* agt. *Rogers* (31 *Barb.* 447), that the powers of a board of health must be exercised in subordination to the judicial authority of the state, and are subject to be suspended and held in abeyance by the order of a court having jurisdiction of the subject, whenever the principal facts upon which its exercise depends are put in controversy and rendered doubtful, until established by due process of law. (*Opinion* BROWN, *J.* 31 *Barb.* 447.)

In this case the affidavits presented on the part of the plaintiffs, show conclusively that the business in which they and the other butchers in New York are engaged, is not a nuisance, and all the main facts presented by the defendants to sustain their position are denied.

The injunction should, therefore, at least be retained until the issues raised in the case can be disposed of by a trial.

*Fourteenth.* It is worthy of remark that the defendants do not show in their affidavits, or pretend that a single accident has ever occurred in the city of New York, from the driving of sheep or hogs through the streets of the city.

*Fifteenth.* The motion to dissolve the injunction should be denied, with costs.

CHARLES TRACY, *for the defendants.*

I. The plaintiffs' demand for an injunction to restrain the defendants from interfering with the business or property of any butcher in New York or Brooklyn, is incapable of support.

Injunctions are given only to restrain injuries to the plaintiff or the plaintiff's rights (*Code,* § 219).

The other butchers who are invited by the plaintiff to come in as co-plaintiffs, but have not in fact come in, are not plaintiffs (*Code,* §§ 117, 119).

The action is not brought for the benefit of all those other butchers, but only such of them as shall come in and share the expenses.

Such an injunction would leave the defendants at their peril to guess who were butchers and who were not.

II. The ordinances in question were duly made by the metropolitan board of health.

(1) The board has power to make ordinances for the " protection of the public health," by virtue of section 20, of the act of 1866, as amended (*Met. Health Act, p. 33*).

(2) It also has all the powers for " preserving or protecting life or health, or preventing disease," given to the New York Common Council, or any municipal or health authorities in the metropolitan district (*Met. Health Act,* § 12, *p. 8*).

Thus all the power for the protection of life, as well as health, to be found in the charters of New York and Brooklyn, devolve on the board.

(3) The power of the common council of New York to

make ordinances regulating the driving of cattle, in order to protect human life, is unquestionable. (*Charter*, § 14 [*Davies' Stat.* 175]; *Act of* 1830 [*Davies*, 199]; *Act of* 1849 [*Davies*, 203]; *Act of* 1853 [*Davies*, 210]; 1 *S. L.* 1857, *p.* 874, § 2.)

Like power has been exercised by the common council repeatedly, by ordinances against fast driving, rock blasting, hoistways, sinks, &c.

(4) The common council of Brooklyn had ample power of that kind, by their charter (*S. L.* 1834, *p.* 98, § 26). This power has also been exercised repeatedly (*Ordinances, p.* 293, 295, 300, 353).

(5) A discretion is confided to the board, and it is its duty to determine what things need be restrained by ordinances for the protection of life or health. It is a matter of skill as well as discretion.

(6) The requiring of a permit from the board to any person intending to exercise the trade of a butcher, is a proper precaution. No license fee is demanded, but the board deems it needful to the safety of life and health in the district, that a trade which is capable of so much mischief, if negligently conducted, should be in the hands of known and suitable men. The Brooklyn charter specifies this very license.

(7) Ordinances under such powers have been sustained by the courts uniformly. (*The Mayor* agt. *Williams*, 15 *N. Y.* 502; *The Mayor* agt. *Ryan*, 2 *E. D. Smith*, 368; *The Mayor* agt. *Rice*, 4 *Id.* 604; *People* agt. *Reed,* 1 *Parker*, 481; *City of Brooklyn* agt. *Cleves, Lalor's Sup.* 237; *City of Rochester* agt. *Collins*, 12 *Barb.* 569.)

III. The constitutionality of the metropolitan health law cannot be disputed.

One judge has pronounced it constitutional; other judges have treated it as constitutional, and not one has held to the contrary.

(1) The delegation of power to make local ordinances is no breach of the constitution, and it has been done by every legislature in the laws concerning cities and villages.

(2) The power of the board to interpose directly, and order and require the suppression of any thing it finds dangerous to health or life, is clearly constitutional. Such power was vested in the city inspector. (*S. L.* 1850, *p.* 607, § 1, *sub.* 3 ; 11 *N. Y. Health Law,* 30.) In other cities the like powers were held (*S. L.* 1850, *pp.* 691, 692). So in the earlier health laws (*Stat. of* 1823, *p.* 79, § 39).

(3) These powers have been recognized by the courts. (*Van Wormer* agt. *Mayor of Albany,* 15 *Wend.* 262 ; *Same,* 18 *Wend.* 169 ; *Duffy* agt. *The People,* 6 *Hill,* 75 ; *Morris* agt. *The People,* 1 *Parker,* 44.)

IV. The courts are not authorized to inquire collaterally into the facts upon which the metropolitan board of health makes its determination, within the province of its discretion. (*McLaren* agt. *Mayor of N. Y.* 1 *Daly,* 243, 250, 251, 252 ; *Van Wormer* agt. *Mayor of Albany,* 15 *Wend.* 262 ; *People ex rel. Savage* agt. *Board of Health,* 33 *Barb.* 344 ; *Belcher* agt. *Farren,* 8 *Allen,* 325, 327, 329.)

DALY, F. J.   This injunction is claimed to be maintainable upon two general grounds : 1st. That the law organizing the board of health is unconstitutional and void.   2d. That if the law is constitutional, the acts sought to be restrained are not within the sanitary powers conferred by the law.   I shall consider these objections in their order.   The act creating the board of health is alleged to be in conflict with the constitution of the state.   1st. Because it confers upon the board the right to deprive a citizen of his liberty and of his property, without due process of law.   2d. Because it confers upon the board powers of local legislation, which, under the constitution, it is insisted, can be conferred by the legislature only upon boards of supervisors, municipal corporations and incorporated villages.   3d. Because it confers upon the board judicial powers, in contravention of the sixth article of the constitution, which provides for and limits the judicial department of the government.   That portion of the constitution known as the bill of rights, declares "no person shall be deprived of life, liberty or

property, without due process of law" (*Art.* 1, § 6). And it is urged that the provision in the fourteenth section of the act, which declares that the board of health may remove any building or thing, which in the opinion of the board, is a public nuisance, or dangerous to life or health, is in conflict with this constitutional provision. There is no ground for this assumption. All that is declared by the act is, that the board may remove or abate a public nuisance, which is merely declaring that it may do what, by the law, a private person may do. It was an established rule of the common law, long before the bill of rights was enacted, that a public nuisance might be removed, taken away or abated, by any person aggrieved thereby, if in so doing he did not disturb the public peace; and that he was not compelled to resort to legal proceedings for its removal. (*Penruddock's Case,* 5 *Coke, p.* 101; *Batten's Case,* 9 *Id.* 54; *Finch's Law Books,* 3 *ch.* 2, *p.* 188; 2 *Lilly's Abm.* 305; *Reeves' History of the English Law, vol.* 1, 344; *vol.* 3, 27, 112.)

It is classed by *Wood,* in his institutes (*B.* 4, *c.* 3), among the remedies which a man has without suit; and the reason, says *Blackstone,* why the law allows this private and sum-mary method of doing one's self justice is, because injuries of this kind require an immediate remedy, and cannot wait for the slow progress of the ordinary forms of justice (3 *Com.* 9). As this was a remedy which was always available without the process of the law, it was no violation of the constitution for the legislature to declare that the board of health 'might make use of it; and the enactment declaring that they might do so, was no new exercise of legislative authority. More than fifty years ago, the body then known as the commissioners of the health office, were authorized by the act of March 30, 1801, to order the removal, abate-ment or discontinuance of any manufactory, trade, work, business or repository, which, in their judgment, was a nui-sance, or by which, in their opinion, the public health or that of individuals might be endangered; and if it were not removed within the time limited by them, then, upon their representation, the mayor or recorder was required to issue

a warrant commanding the sheriff to cause the removal or abatement of the nuisance forthwith. (1 *Rev. Laws*, 1801; *R. and R. p.* 373, § 32.)

And by the act of March 26, 1813, the board of health might cause any cargo or part of a cargo to be destroyed, which, in their opinion, was dangerous to the health of the city (2 *Rev. Laws of* 1813, *p.* 534, § 25). These provisions continued in force down to the adoption of the Revised Statutes; and by the Revised Statutes, the board of health, or the mayor and commissioners of health, might cause to be destroyed any matter or thing within the city dangerous to the public health, when they should judge it to be necessary (1 *Rev. Stat.* 441, § 3). The power of the legislature to do so, it would seem, was not questioned during this long period; on the contrary, it was distinctly recognized in the case of *Van Wormer* agt. *The Mayor, &c., of Albany* (15 *Wend.* 262).

"The several acts of the legislature," said Chief Justice SAVAGE, "confer upon the board of health very large discretionary powers, among other things, concerning the suppression and removal of nuisances. It is right that such a power should exist somewhere, to be exercised upon the proper emergency. If the civil authorities were obliged to await the slow progress of a public prosecution, the evil arising from nuisances would seldom be avoided;" and it was held in that case, which was an action of trespass for pulling down certain buildings, which the board of health caused to be removed as a nuisance, during the prevalence of the Asiatic cholera in Albany, in 1832, that the plaintiff could not show in the action that the premises were not a nuisance, the point having been adjudicated upon by the proper tribunal, the board of health. The decision was, in fact, that the action of the board could not be questioned in a collateral proceeding. It may be reviewed to a limited extent upon a writ of *certiorari* (*Ex parte Mayor of Albany,* 23 *Wend.* 27); and should it order the removal of any matter or thing, in a case where it clearly has no authority, the court may interpose and stay its action, as was held by Jus-

tice INGRAHAM, in the recent case of *Hoffman* agt. *Schultz*, in the supreme court of this district. The present act goes further than the rule of the common law, or the act of 1801 required, for the protection of the property of the citizen, by providing that except in cases of iminent danger from pestilence, notice shall be given to the party to be affected, and an opportunity afforded to 'him to be heard, before the order of the board is executed ; and the legislature having made this provision, courts of justice should act with great caution in interfering with the proceedings of such a body, and interpose only in a case when it is very plain that they are clearly acting without any authority.

It is further urged, that the authority given to the board to order the arrest by warrant, of persons violating the provisions of the act, or the regulations or ordinances of the board, is in conflict with the provision of the constitution, declaring that no person shall be deprived of his liberty without due process of law. The deprivation of liberty here referred to, does not mean the arresting of a person to bring him before the proper judicial tribunal upon the accusation of crime, for that may be done in certain cases without warrant, where one is taken in the act of committing a felony or a breach of the peace, or by an officer upon a reasonable suspicion of having committed a felony (2 *Hawks. P. C. ch.* 12, §§ 19, 20 ; 2 *Inst.* 186) ; or where it is allowable by the custom of particular localities (*Mackally's Case,* 9 *Coke,* 65 *b*). The meaning of the words *without due process of law,* in this connection is, that no one shall be condemned to lose his liberty, unless by the presentment or indictment of a grand jury, and a regular trial according to the course of the common law. The words of magna charta, *by the law of the land,* and the words, *without due process of law,* both of which are used in our constitution, mean, according to Lord COKE, the same thing, pertinent of good and lawful men (2 *Inst.* 50). And Chief Justice RUFFIN, in referring to one of these synonymous terms, in the elaborate opinion which he rendered in *Hoke* agt. *Henderson* (4 *Dev. N. C.* 15), declares that it meant depriving a citizen of the rights of person or pro-

perty without a regular trial, according to the course and usage of the common law; and that that is undoubtedly the meaning of these terms, will be apparent upon a perusal of the early English statutes in relation to personal liberty, the object of their enactment being to prevent a man being deprived of his liberty or of his property, as Blackstone has expressed it, without accusation or trial. The arrest which this act allows upon the warrant of the board, is simply to bring the offender before a magistrate. The fourteenth section declares, that the order of arrest shall be executed as a warrant from a justice or judge, and that the party arrested shall be taken before a magistrate, and treated thereafter as having the *rights* and the liability of a party under arrest for a misdemeanor, a procedure which in no way deprives the accused of the rights secured to him by the constitution.

The next objection is one that scarcely calls for a serious reply; that the act of the board forbidding butchers to drive their cattle through the city, except at certain specified hours, is under the constitution, depriving them of their property. What the constitution means is, the taking away of a man's property. The act of the board here simply regulates the manner of the use of it, so far as the interests of the public are concerned. This the constitution nowhere interdicts. Our statute books abound with laws of this description, and without them the ordinary objects of civil government could not be effected. In *Bosworth* agt. *Hearne* (*Cases Temp. Hardwicke*, 405, *Andr. R.* 92), a regulation of this kind was held to be one that a municipal corporation might enact.

The twentieth section of the act empowers the board to enact such by-laws, rules and regulations, as it may deem advisable, in harmony with the provisions of the act, and not inconsistent with the constitution and laws of the state, for the regulation of its action, and that of its officers and agents, in the discharge of its and of their duties, and for the protection of life and public health, and to alter, annul or amend the same from time to time; and it requires the board to make and publish annually, a "code of health

ordinances," for the protection of the public health, and requires all courts and tribunals, and any judges or justices thereof, to take cognizance of, and give effect to them, and that they may be enforced by a penalty not exceeding fifty dollars, to be recovered in any justices or district court.

It is said that the power to make law is vested by the constitution in the senate and assembly, and that it cannot be delegated, except to the bodies named in the constitution, cities, incorporated villages and boards of supervisors. There is no express provision prohibiting the legislature from empowering public bodies or corporations to enact and enforce by-laws or ordinances for local purposes; but it is argued, because the constitution declares that the legislature may confer upon boards of supervisors such further powers of local legislation and administration, as they shall from time to time prescribe, and have made it the duty of the legislature to provide for the organization of cities and incorporated villages (*Art.* 3, § 17; *Art.* 8, § 9), that it follows by implication, that the naming of these bodies is an indication that it was not to be extended to any others; but the maxim *expressio unius est exclusio alterius*, as was said by Justice WILLARD in *Barto* agt. *Himrod* (4 *N. Y. R.* 492), is more applicable to deeds and contracts than to a constitution, and requires great caution in its application in all cases. The legislature is the depository of the original, exclusive and sovereign power of the people, except so far as it is restrained by constitutional enactments; and to warrant the conclusion, where there is no express prohibition, that any part of it is taken away by natural implication, the intention should be as plain as if it had been expressed in words. " The power of a state legislature," says CUSHING, " is general and unlimited, and extends to all subjects of legislation, except in those particulars wherein it is expressly restrained; consequently, when a question arises, whether a given subject is within the constitutional power of a state legislature, the inquiry should be not whether it is conferred specifically, but whether it is withheld in terms, or by necessary implication. If it cannot be said affirmatively, that the power in

question is withheld, then it exists under the general grant. If the inquiry leads merely to a doubt of the power, the doubt is in favor of its being granted " (*Cushing on the Law of Legislative Assemblies*, § 717, *I. p.* 282). The legislature constantly exercises the powers of conferring upon local bodies created for public purposes, the authority to make and to enforce by-laws or ordinances. From the year 1794 down to the time of the revision of the constitution in 1846, numerous acts had been passed by which various public bodies, the common council of New York, the commissioners of the health office, the commissioners of health and the board of health, first established in 1804, were empowered to make rules and regulations for the protection of the public heath, which were enforced with the effect of law. By the act of April 9, 1804, masters of vessels violating any of the regulations made · by the commissioners of the health office, were declared to be guilty of a misdemeanor ; and an analogous provision in relation to the orders and regulations of the health commissioners, was contained in the act of March 6, 1813. All these bodies were created by statute, and underwent many modifications and changes, in the course of subsequent enactment ; but this piece of local legislation, as it has been called, or the right to adopt rules, regulations or ordinances, which were enforced as laws, for the preservation of the public health, was continued through the many changes and modifications in these bodies, and was of a very comprehensive character. (*Laws of New York,* 1794, 3 *G.* 149; 1796, *Id.* 308 ; 1797, *Id.* 368 ; 1798, *J. & A.* 403 ; 1799, *Id.* 587; 1802, 1 *K. & R.* 361, 369, 372 ; 1804, 3 *W.* 469 ; 4 *W.* 43, 410, 460 ; 2 *Rev. Laws of* 1813, *pp.* 524, 533 . 1 *Rev. Stat.* 422, 440, 441; *Laws of* 1832, *p.* 582, § 5; *Laws of* 1820, *pp.* 607–8, *Art.* 1.)

In 1828 the legislature conferred upon the trustees of the village of Albion, the right to make such prudential by-laws, rules and regulations, from time to time, as they should deem proper ; and an action having been brought against the trustees for enforcing a by-law against bowling alleys, the question came up whether the legislature could confer upon the

trustees the right to make such local laws, and Justice COWEN disposed of it in these words : " It is said the constitution gives the legislative power to a senate and assembly, which cannot delegate the right to make laws. The answer is, that the words of the constitution comprehend and imply all the accustomed and acknowledged powers of legislation ; among these is the power to create municipal corporations, with the right to pass by-laws for local objects " (*Tanner* agt. *The Trustees of Albion*, 5 *Hill*, 130.)

The legislature having exercised a power of this nature for more than half a century, it would require something more explicit than the provision in the constitution upon which the plaintiffs rely, to show that it was the intention of that instrument to restrict, abridge or take it away. If it had been restrained under previous constitutions, then there would be ground for holding that a declaration in the constitution, that the legislature might confer it upon boards of supervisors, should be regarded as a constitutional permission which was limited to such bodies alone ; but the legislature, as I have said, is the depository of the sovereign power of the people, except so far as it is restricted by the constitution, and it does not necessarily follow, because the constitution says that the legislature may confer a power upon the board of supervisors, that it is to be taken as a constitutional prohibition against their conferring it upon any other body which they may think it expedient, thereafter, for public purposes, to create. " The conflict between a statute and a fundamental law," said Judge EMOTT, in *The People* agt. *The Board of Supervisors* (27 *Barb*. 593), "must be plain, beyond any reasonable doubt, before we convict the legislature, and annul their laws. These are obvious truths, which have been again and again repeated by court and judges, who have, perhaps, not in all cases, acted up to their requirement. Neither must it be forgotten that the power of the legislature is not derived from, nor conferred by the constitution of the state. That instrument does indeed organize a legislature, and transfer to them the power of legislation of the people of the state. But it does not

create the power, but only the instrument for its exercise. The power is the sovereign power of the people, and in a political and juridical sense, it is omnipotent and irresponsible, except where it is expressly restrained by the organic instrument. The constitution of the state is to be resorted to not to see what powers are conferred upon the legislature, but what are withheld; not how they are authorized to act, but in what respect they are restrained or forbidden to exercise power. Such restrictions and limitations ought to be clear and explicit. There is a wide distinction between such an instrument and a grant of limited powers like the constitution of the United States."

It was held in *The People* agt. *Draper* (15 *N. Y. R.* 533), that the legislature might constitutionally establish new civil divisions of the state, embracing the whole or part of different counties, for the general purposes of government, which in that case had been done by forming the counties of New York, Kings, Westchester and Richmond, into the metropolitan police district, under commissioners, to whom were transferred powers previously exercised by bodies or officers in these different counties. It was held that there was nothing in the constitution which required that these local functionaries should always possess the same functions as when the constitution was adopted; that changes might be made by which power might be taken from the one and given to the other. "If we were to establish the principle," said C. J. DENIO, "that the legislature can never reduce the administrative authority of counties, cities or towns, can never resume in favor of the central power any portion of the jurisdiction of these local divisions, or change the partition of it among them as it existed when the constitution was adopted, we should, I think, make an impracticable government. It is the business of the legislature to adjust, in the interest of the whole people of the state, the distribution of the powers of government, taking care that no direct provision of the constitution is violated, and that no arrangement which it has made is incidentally disturbed."

The legislature followed a like course in creating the

present board of health, embracing the same territorial division of the state, and conferring upon a board of commissioners powers which had before been exercised by public bodies or officers within these respective counties. They had the right to do this; and there is nothing in the constistitution, in my judgment, which deprives the legislature of the authority to confer upon the board the power to make by-laws, rules, regulations and health ordinances.

The next objection that the law is unconstitutional, because it confers upon the board judicial powers, is equally unfounded. Even if such were the fact, it would not render the law unconstitutional. The court of appeals have decided in *Sill* agt. *The Village of Corning* (15 *N. Y.* 297), that there was nothing in the constitution prohibiting the legislature from creating new courts; that they could not create courts of the like jurisdiction, or fulfilling the same general purposes as the courts for which the constitution had made provision; but that beyond that, the power of the legislature was unlimited; and they held that an act creating a local court for the village of Corning was constitutional and valid. All that the legislature have done in this case, has been to authorize the board, by its warrant, under its seal, and attested by the signature of its president and secretary, to order the arrest of any person resisting its order, or violating any law, ordinance or order of the board, having first entered upon its minutes or filed in its records, what it may regard as adequate proof of such violation or resistance, and the person so arrested is to be taken before a magistrate, and treated as a person under arrest for a misdemeanor of the nature indicated by the order of the board.

This is simply giving the board jurisdiction to order the arrest of offenders against the provisions of the act, or the regulations, orders or ordinances of the board; and this the legislature has the right to do, there being nothing in the constitution which expressly, or by natural implication, prohibits them from doing. Chief Justice DENIO, in declaring in the case just quoted, that the legislature had the power to create a court in the village of Corning, says: The

maxim, *expressio unius est, exclusio alterius,* has no application to the case of local tribunals, established for the purpose of redressing a certain description of grievances, in particular limited localities. The state, as to subjects of a domestic nature, is a soverein political power, and the legislature can provide such agencies for the administration of the law and the maintenance of public order as it shall judge suitable, where no prohibition expressly made or necessarily implied, is found in the constitution. The provision in the fourteenth section, that the action, proceedings, authority and orders of said board shall be regarded as in their nature judicial, and be treated as *prima facie* just and legal, was also, upon the authority of the case above quoted, within the power of the legislature to enact.

This disposes of all the constitutional objections which have been taken to this act; and holding it, as I do, to be constitutional and valid, it remains now but to consider whether it has conferred upon the board the power to do the acts which this injunction was granted to restrain. The first is the prohibition in the forty-fifth section of the health ordinances, that no cattle shall be driven in the built up portions of New York or Brooklyn, except during certain specified hours, and then only in certain numbers, and shall be driven in streets and avenues leading to their destination, where they will least endanger the lives of human beings. The powers of the board are very extensive. The object of the act as expressed in its title, is "to create a metropolitan sanitary district and board of health therein, for the preservation of life and health, and to prevent the spread of disease;" and to accomplish the object of its creation, all the authority, duties and powers, possessed by bodies and public officers previously existing in the district, for the purpose of preserving or protecting life or health, or preventing disease, are conferred exclusively upon the board, to be exercised as set forth in the act, to such an extent, and in such place and manner as the board may provide, for the greater protection and security of health and life in the district, and the appropriate parts of it. If the driving of cat-

tle through the city be at all attended with danger to life or health, a regulation of this kind by the board is clearly within the powers conferred upon them. This has been shown upon the motion; and though numerous affidavits by butchers long established in business in this city have been read, to the effect that they have never known or heard of any accidents in this city arising from such a cause, there has been evidence adduced on the part of the board, showing that such accidents have occurred during the past two years, and that the breaking loose and running through the streets of wild or mad cattle, to the danger of the lives of citizens, has been not of unfrequent occurrence. This is sufficient to show that the subject is one within the jurisdiction and power of the board, and that they have a right to make such a regulation respecting it.

The next is the provision in section thirty-nine of the ordinances, that no person shall become, continue or engage in the business of a butcher, cattle dealer, or vegetable dealer, at or in any public or private market or stand in New York or Brooklyn, without a permit from the board. This is a more doubtful power. From the earliest colonial period the corporation of the city of New York, by virtue of the municipal authority with which it was invested as a body politic and corporate, exercised the right of determining who should be butchers, within what part of the city or corporate limits cattle might be slaughtered, and ordinances were passed forbidding any one to follow the calling of a butcher without the consent or license of the city authorities. An ordinance of this character existed under the Dutch as early as 1656 (*City Records*); and under the first of the English governors in 1665, butchers were required to take an oath that they would slaughter no cattle without " a ticket of consent," or as one would express it, a permit from the agent of the corporation (*City Records*). This exercise of corporate authority was specifically confirmed both by the Dongan and the Montgomery charters, in the first of which instruments, after a confirmation of all their previous powers, the corporation were authorized to pass ordinances for the good

rule, oversight, correction and government of the several tradesmen, victuallers, &c.; and by the Montgomery charter, ordinances for declaring how the inhabitants should "use, carry and behave themselves," in their functions and business (*Kent's Charter, pp.* 10, 26, 93). And the corporation would have possessed the power if there had been no such grant, for a municipal corporation may regulate the manner of carrying on any trade or business within the municipality, so far as to prevent monopoly, the sale of unfit commodities, and to insure proper conduct in those who practice it (*Willcock on Municipal Corporations*, 141). Thus, it has been held that a by-law that there should be no butchers or tallow chandlers in a particular street, or that no butcher should slaughter any beasts within the walls of a city, or expose fresh meat for sale within certain limits, or upon a particular day, or excluding brewers carts from the streets during certain hours, were not laws in restraint of trade, but public regulations, which a municipal corporation had the right, if they thought proper, to establish. (*Pierce* agt. *Bartrum, Cowp.* 270; *Player* agt. *Jenkins,* 1 *Sid.* 284; *Bosworth* agt. *Hearne, Cases Temp. Hardwicke,* 405; *Andrews' R.* 92; 2 *Strange,* 1085; *The Butchers' Company* agt. *Morey,* 1 *H. Bl.* 370; *Comyn's Digest, Action on the Case for Nuisance,* c.) The corporation of the city of New York, from the year 1676 to 1789, passed various ordinances, by which at first cattle were required to be slaughtered outside the city wall, the present Wall street, then at the public slaughter house, the location of which was gradually removed by successive enactments as far as Corlear's Hook, when being found productive of great inconvenience to the butcher and to the citizen, the public establisment was abandoned, and the butchers from that time forward, were allowed to have their own private slaughter houses (*De Voe, The Market Book, vol.* 1, *pp.* 54, 81, 264, 297, 368). By the act of April 9, 1813, section 272, the corporation were empowered to regulate the butchers of the city of New York, to prohibit and restrain them from carrying on their business at any other times and places than such as might be ·designated

for that purpose by the common council, and to prohibit and restrain all and every person or persons, other than licensed butchers, from carrying on the business or calling of a butcher, or any part or branch thereof, within the limits of the city; and a similar law was passed in 1834 for the city of Brooklyn, the validity of which, and of the ordinances under it, was sustained in the case of *The City of Brooklyn* agt. *Cleves* (*Lalor's R.* 231). The corporation of New York, by repeated ordinances, have carried out these provisions, by providing that no person shall exercise or carry on the trade or business of a butcher in the public market under the penalty of $50, unless licensed by the mayor, or permitted to do so by the authority of the common council; together with numerous regulations as to the time when, and the place where, meat may be sold; the kind or quality; the weights and measures to be used; prohibiting the sale of any article or thing in the public market without a registered permit; enactments against forestalling, and other enactments too great in number to be here enumerated; the rigid compliance with which is enforced by the enactment of numerous penalties (*Revised Corporation Ordinances of* 1845, *from page* 91, *to* 117).

This power of determining who should be butchers, and how and where their trade should be carried on, had its reason, no doubt, in the prejudicial effect which such occupation might have in compactly built cities, upon the public health, if not properly conducted, but not wholly so. It was but a part of that general power which municipal governments have exercised from their earliest institution, over all trades or occupations, so far as they affected the public interest, and which is essential for the preservation of good order and the general purposes of government. So far as this power relates to the protection of life and health, or the prevention of disease, it is taken away by this act from the corporations of the cities of New York and Brooklyn, and " *conferred exclusively* " upon the board of health, by whom, after the passage of the act, it is to " be exclusively exercised," and with it is necessarily granted all such inci-

dental power as may be requisite to give effect to, and carry
out the intent of the legislature.    Whether this grant is
broad enough to empower the board to declare that no man
shall carry on the business of a butcher without their per-
mission, is a point upon which I confess, I entertain consid-
erable doubt.    This power existed in the corporations of
New York and Brooklyn; and if the defendants possess it,
they possess it exclusively, for whatever power has been
transferred to them is vested in them exclusively.    It can-
not exist in both bodies; and if, as the defendants assume,
it has passed to them, the license of the mayor is unavaila-
ble, as it would be of no effect or use without the permission
of the board of health.    If the board possess this power
alone, then much of the legislation referred to, of the corpo-
rations of New York and Brooklyn upon the subject of
butchers and markets, would be abrogated; and as those
ordinances were designed to accomplish other objects besides
the preservation of health and the prevention of disease, it
would be very difficult to determine what part of them
remains, and what portions have ceased to exist.    But it is
not essential that I should pass upon this question in this
action.    The plaintiffs ask that the board of health should
be enjoined from compelling them or any butchers to take
out permits to carry on their business, and this the plaintiffs
are not entitled to, as they have ample legal remedy if the
defendants have no authority to make such an ordinance,
and should undertake to enforce it.    If arrested by the
warrant of the board for refusing to comply with the pro-
vision, an ample opportunity is afforded to avail themselves
of this defense, and there is no reason why a court of equity
should interpose by injunction.

The plaintiffs set forth that they are informed and believe,
that the defendants threaten and give out that they intend
to compel the removal of the slaughter houses of all the
butchers in the city of New York to some remote part of
the island of New York, and that if this threat is put into
execution, they and the butchers generally will sustain great
injury.    The act declares that the powers conferred upon

the board for preserving health and life, or for preventing disease, may be exercised *to such an extent* and in *such a manner as they may provide*, for the greater protection and security of health and life in the district; and if the board have, or should determine that such an act is necessary for that purpose, I think any court of justice would and should hesitate to interfere with the decision. It is made by the legislature, the tribunal to determine to what extent, and in what manner its powers are to be exercised for the greater protection and security of health and life in the district which the statute has created; and though its determination upon such a subject may not be beyond control, little short of the abuse of its powers, or a case where it was palpably acting without authority, would justify an interference upon the part of the courts. The course of legislation from 1801 to the present time, has been to confer upon bodies of this description large discretionary powers, to be exercised upon emergencies for the public welfare. They have been authorized as I may express it in general terms to do or cause to be done, whatever might be necessary for the preservation of the public health; and if the present board have come to the conclusion that the removal of the slaughter houses, as suggested, is necessary for that purpose, it is certainly a matter upon which they may fairly exercise their judgment, and with the fair exercise of it no judicial tribunal should interfere. (*Birdsall* agt. *Phillips,* 17 *Wend.* 164; *Allyn* agt. *The Commissioners of Highways of Schodack,* 19 *Id.* 342; *Simpson* agt. *Rhinelander,* 20 *Id.* 103.; *Ex parte Mayor of Albany,* 23 *Id.* 277.) Of the propriety of this course on the part of this court as a judicial tribunal, I entertain no doubt, while at the same time I doubt exceedingly the utility or necessity of the removal of all the slaughter houses, in the manner proposed, as a measure essential to the preservation of the public health; for a slaughter house is not in itself a nuisance, thought it may become so by the manner in which it is conducted. I find but one reported case in which a slaughter house was indicted as a nuisance, and that was one for the slaughtering of horses (*Rex* agt. *Cross,* 2 *C.*

& P. 483), while the books abound with proceedings for the removal of other trades or manufactories as nuisances. Mr. Thos. De Voe, in a paper read before the Polytechnic Association of the American Institute, has collected many facts upon this subject, and among others, he refers to a letter of Dr. Hosack, an eminent physician, who writing in 1822, during the prevalence of the yellow fever in this city, notices as remarkable, that in the north-eastern part of the city, occupied by the slaughter houses, though the air was loaded with the offensive vapors arising from the decomposition of blood and the other offal of these establishments, yet the streets there were remarkable for their salubrity, and had in no instance been the seat of pestilence, even when it was prevailing in the vicinity of the wharf; also to similar experience in Rio Janerio, during the severe yellow fevers which prevailed there in the years 1851, 1852 and 1853; to the testimony of Dr. Smith, before a committee of the New York Assembly, in 1865, declaring that in the seventeeth ward of the city, inhabited chiefly by the wealthier classes, and where there are fifty-six slaughter houses, the per centage of death was seventeen in one thousand, or that of a rural town, while in the fourth and sixth wards, where there are no slaughter houses, it is very large, being from thirty-five to forty in one thousand; and to the report of a committee of the national institute of France in 1805 (9 *Med. Repositary*, 341), who after investigation of the subject, declare that slaughter houses are not injurious to the health of the vicinity, where they are properly conducted. These facts, together with the absence of reported cases in the books of proceedings or actions against such establishments as nuisances, would seem to indicate that they are not necessarily prejudicial to health, although otherwise offensive and unpleasant. An action for a nuisance, says *Comyn*, a very great authority in the law, will not lie against a butcher for the use of his trade, though it be to the annoyance of his neighbor, for it is but a reasonable exercise of his right if he use his trade in a convenient place (*Comyn's Digest, Action on the Case for a Nuisance* [c.]). Butchers, by municipal regulations, might be

required to carry on their business in a convenient place, but not necessarily for the reason that it is injurious in its nature to the public health, but because there are parts of a city especially devoted to residences, the comfort and enjoyment of which would be lessened by the unpleasant odors arising from such places, when they can as conveniently be located elsewhere.

Of the supervising power of the board of health over slaughter houses, and of its right to enact and enforce such regulations as will secure their being conducted in such a manner as to prevent any injury to the public health, there can be no doubt, and the board would even be restrained from doing this by the very general terms of this injunction.

The motion to dissolve the injunction must, therefore be granted.